47 A.3d 63

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Mark Newton SPOTZ, Appellant.**

Supreme Court of Pennsylvania.

Submitted Aug. 29, 2011.

Decided June 26, 2012.

See also 610 Pa. 17, 18 A.3d 244 and 587 Pa. 1, 896 A.2d 1191.

172

178

Michael Hugh Gonzales, Defender Association of Philadelphia, Eric John Montroy, Federal Community Defender Office, Eastern District of PA, David Lee Zuckerman, Defender Association of Philadelphia, Philadelphia, for Mark Newton Spotz.

Kelly M. Sekula, Amy Zapp, Harrisburg, PA Office of Attorney General, for Commonwealth of Pennsylvania.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## OPINION

Justice McCAFFERY.

Mark Newton Spotz ("Appellant") has appealed from the denial of his petition for collateral relief filed pursuant to the Post Conviction Relief Act ("PCRA"),[1] following his conviction in York County for first-degree murder and the imposition of a sentence of death. Concluding that there is no merit to any of the numerous issues that Appellant has raised on appeal, we affirm the order of the PCRA court.

To begin, we set forth the relevant facts of the case, summarized primarily from this Court's opinion on direct appeal. See Commonwealth v. Spotz, 562 Pa. 498, 756 A.2d 1139, 1147–48 (2000) ("Spotz II"). At 6:20 a.m. on February 2, 1995, in York County, Appellant approached Penny Gunnet's vehicle on the pretense of asking her for directions. He forced her into the passenger seat of her car at gunpoint and then drove to an isolated area. Christina Noland, Appellant's then-girlfriend, followed him, driving a car they had stolen the previous day in Schuylkill County. While both cars were stopped on an isolated road, Noland heard three gunshots. Appellant then sped off in Ms. Gunnet's car, with Noland in

1. 42 Pa.C.S. §§ 9541–46.

unsuccessful pursuit in the other stolen car. Ms. Gunnet's body was found later that morning under the wheels of her abandoned car. Hours after the murder, Appellant tried to sell some of Ms. Gunnet's jewelry, and he later gave her rings to his ex-wife, Michelle Rhinehart.

Police apprehended Appellant in a motel room in Carlisle, Blair County, the day after Ms. Gunnet's murder. When Appellant opened the door to the room and surrendered, he discarded a silver nine-millimeter semiautomatic pistol that was subsequently identified as the weapon that had fired at least two of the three nine-millimeter bullets recovered from Ms. Gunnet's car. In the motel room, police found Appellant's bloodstained jeans, a knife, nine-millimeter "full metal jacket" ammunition, five credit cards issued in Ms. Gunnet's name, and one credit card issued in her husband's name.

The abduction and murder of Ms. Gunnet was part of a three-day crime spree, during which Appellant committed four homicides in four counties. Two days before Ms. Gunnet's murder, on January 31, 1995, Appellant shot and killed his brother, Dustin Spotz, in Clearfield County and then fled with Ms. Noland. The next day, in need of money and a vehicle, Appellant abducted June Ohlinger at gunpoint in Schuylkill County, drove her car to a remote area, and then shot her in the head. After a brief trip to Rehoboth Beach, Delaware, where Appellant and Ms. Noland attempted to alter their appearances, they drove to York County in search of another vehicle to steal. This was the point at which they came upon Ms. Gunnet. Following the abduction and murder of Ms. Gunnet, Ms. Noland went to Altoona in Blair County, where she surrendered to police, and Appellant went to Cumberland County, where he abducted and murdered his fourth victim, Betty Amstutz, and stole her car and her money.

Appellant was tried separately for each homicide. He was ultimately convicted of voluntary manslaughter in the death of Dustin Spotz in Clearfield County, and of first-degree murder in the deaths of Ms. Ohlinger, Ms. Gunnet, and Ms. Amstutz, in, respectively, Schuylkill, York, and Cumberland Counties. During the guilt phase of his trials in York and Cumberland

Counties, Appellant proceeded *pro se.* Although the Superior Court overturned Appellant's voluntary manslaughter conviction and granted him a new trial, this Court reversed and reinstated the conviction. *Commonwealth v. Spotz,* 582 Pa. 207, 870 A.2d 822 (2005) (*"Spotz IV "*). On direct appeal, this Court affirmed each of Appellant's three first-degree murder convictions and sentences of death. *See Commonwealth v. Spotz,* 552 Pa. 499, 716 A.2d 580 (1998) (Schuylkill County) (*"Spotz I "*); *Spotz II,* 756 A.2d at 1139 (York County); *Commonwealth v. Spotz,* 563 Pa. 269, 759 A.2d 1280 (2000) (Cumberland County) (*"Spotz III "*). In addition, we subsequently affirmed the orders of the PCRA courts denying Appellant collateral relief from his Schuylkill County and Cumberland County first-degree murder convictions. *See, respectively, Commonwealth v. Spotz,* 587 Pa. 1, 896 A.2d 1191 (2006) (*"Spotz V "*) and *Commonwealth v. Spotz,* 610 Pa. 17, 18 A.3d 244 (2011) (*"Spotz VI "*). Here, Appellant seeks review of the order of the PCRA court denying his petition for collateral relief from his York County first-degree murder conviction.

Appellant filed a *pro se* PCRA petition challenging his York County conviction as well as a request for appointment of counsel in April 2001.[2] On August 20, 2001, the Defender Association of Philadelphia filed a PCRA petition on Appellant's behalf. *See* Amended Petition for Habeas Corpus Relief under Article I, Section 14 of the Pennsylvania Constitution and for Statutory Post–Conviction Relief under the PCRA, filed 8/20/01. Subsequently, the Defender Association filed two supplements, on May 20, 2002, and May 31, 2007, respectively. With all of these filings, Appellant raised 34 issues before the PCRA court. PCRA Court Opinion, dated March 25, 2010, at 4. The court held a PCRA hearing from September 17 through September 19, 2007.[3] After Appellant's com-

2. Appellant also filed a motion for a stay of execution, which was granted on June 21, 2001.

3. The PCRA court had deferred an evidentiary hearing on Appellant's PCRA petition pending this Court's disposition of Appellant's challenge to his voluntary manslaughter conviction in the killing of his brother. This manslaughter conviction had been introduced as an aggravating circumstance during the penalty phase of Appellant's York County trial.

petency was placed into question, the PCRA court continued the hearing, pending completion of competency evaluations. The PCRA court subsequently determined that Appellant was competent, and then resumed the PCRA hearing from June 9 through June 13, 2008. Appellant appeared via videoconference. *Id.* at 5. The PCRA court filed an opinion and order on March 25, 2010, denying all of Appellant's claims.

Appellant filed a timely notice of appeal to this Court, raising 11 issues for review,[4] most of which include several

As mentioned in the text, *supra,* the Superior Court had overturned the manslaughter conviction and granted Appellant a new trial, but this Court reversed and reinstated the conviction. *Commonwealth v. Spotz,* 582 Pa. 207, 870 A.2d 822 (2005) (*"Spotz IV"*).

4. Appellant's issues, reproduced verbatim from his brief, are the following:

 1. Was Appellant entitled to a new trial because his waiver of counsel at the guilt-phase of trial was not voluntary, knowing, and/or intelligent?
 2. Was Appellant denied due process and the right to confrontation when the Commonwealth failed to disclose exculpatory evidence that would have impeached the testimony of its key witness, Appellant's co-defendant, and failed to correct her false and misleading testimony?
 3. Was Appellant denied due process and the right to confrontation when the Commonwealth failed to disclose exculpatory evidence that would have impeached the testimony of Charles Carothers, stood silent when Carothers misrepresented there was no deal, and in bad faith destroyed its notes of its interview with Carothers in which the offer had been tendered?
 4. Were counsel ineffective for failing to investigate and develop the guilt-phase defenses of voluntary intoxication and diminished capacity?
 5. Was Appellant denied his right to a fair trial as a result of court error, prosecutorial misconduct, and ineffective assistance of counsel?
 6. Was Appellant entitled to a new sentencing hearing as a result of prosecutorial misconduct in the sentencing phase of trial?
 7. Were counsel ineffective for failing to investigate, develop, and present available mitigating evidence and rebut aggravating circumstances?
 8. Was Appellant entitled to a new sentencing hearing because the sentencing jury improperly found the aggravating circumstance that the defendant committed the killing during the perpetration of a felony?
 9. Was Appellant denied a fair penalty hearing as a result of court error, conflict of interest, and ineffective assistance of counsel?

sub-issues, for an approximate total of 37 claims. Before addressing the issues raised, we set forth our standard of review, the relevant statutory requirements under the PCRA, and the relevant legal principles controlling claims of ineffective assistance of counsel. *See Spotz VI*, 18 A.3d at 259–60.

Under the applicable standard of review, we must determine whether the ruling of the PCRA court is supported by the record and is free of legal error. *Commonwealth v. Hutchinson*, 611 Pa. 280, 25 A.3d 277, 284 (2011). The PCRA court's credibility determinations, when supported by the record, are binding on this Court; however, we apply a *de novo* standard of review to the PCRA court's legal conclusions. *Id.*

To prevail on a petition for PCRA relief, a petitioner must plead and prove, by a preponderance of the evidence, that his or her conviction or sentence resulted from one or more of the circumstances enumerated in 42 Pa.C.S. § 9543(a)(2). These circumstances include a constitutional violation or ineffectiveness of counsel, either of which "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S. § 9543(a)(2)(i) and (ii). In addition, a petitioner must show that the claims of error have not been previously litigated or waived. 42 Pa.C.S. § 9543(a)(3). An issue has been waived "if the petitioner could have raised it but failed to do so before trial, at trial, on appeal or in a prior state post[-]conviction proceeding." 42 Pa.C.S. § 9544(b). An issue has been previously litigated if "the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue." 42 Pa.C.S. § 9544(a)(2); *see Hutchinson, supra* at 284–85; *Spotz VI, supra* at 259.

With respect to claims of ineffective assistance of counsel, we begin with the presumption that counsel is effec-

10. Was Appellant entitled to a new sentencing hearing because the court did not instruct the sentencing jury that a capital defendant who is sentenced to life in prison in ineligible for parole?
11. Was Appellant entitled to relief from his conviction and sentence because of the cumulative effect of the errors committed at trial?
Appellant's Brief at 1–2 (Statement of Questions Presented).

tive.[5] *Hutchinson, supra* at 285. To prevail on an ineffectiveness claim, a petitioner must plead and prove, by a preponderance of the evidence, three elements: (1) the underlying legal claim has arguable merit; (2) counsel had no reasonable basis for his or her action or inaction; and (3) the petitioner suffered prejudice because of counsel's action or inaction. *Id.* (citing *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973 (1987)). With regard to the second, *i.e.*, the "reasonable basis" prong, we will conclude that counsel's chosen strategy lacked a reasonable basis only if the petitioner proves that "an alternative not chosen offered a potential for success substantially greater than the course actually pursued." *Id.* (quoting *Commonwealth v. Williams*, 587 Pa. 304, 899 A.2d 1060, 1064 (2006)). To establish the third, *i.e.*, the prejudice prong, the petitioner must show that there is a reasonable probability that the outcome of the proceedings would have been different but for counsel's action or inaction. *Id.*

## Issue 1: Waiver of Counsel

In Issue 1, Appellant claims that his guilt-phase waiver of counsel was constitutionally invalid because of four alleged circumstances: (a) counsel's conflict of interest; (b) counsel's failure to investigate or prepare a guilt-phase defense; (c) Appellant's mental incapacity; and (d) the trial court's improper restrictions on standby counsel. Just prior to trial, Appellant indicated to the court that he wanted to proceed *pro se* because of alleged conflicts with his counsel, assistant public defenders Bruce Blocher and Suzanne Smith. After an extensive colloquy, the trial court granted Appellant's request to represent himself, and appointed Mr. Blocher and Ms. Smith

---

5. This Court decided Appellant's direct appeal on August 22, 2000, at which time the prevailing law required that a petitioner raise claims of trial counsel ineffectiveness at the first opportunity upon obtaining new counsel. *See Commonwealth v. Hubbard*, 472 Pa. 259, 372 A.2d 687 (1977), *overruled by Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726 (2002). The record indicates that Appellant acted *pro se* during the guilt phase of his trial, and was represented by assistant public defenders Bruce Blocher and Suzanne Smith during the penalty phase of trial as well as on direct appeal. This PCRA petition thus constitutes the first opportunity for Appellant to raise claims of ineffectiveness of penalty phase or direct appeal counsel.

as standby counsel. Notes of Testimony ("N.T.") Trial, 4/8/96, at 12, and 4/12/96, at 32–36. Appellant does not challenge the colloquy; rather, he asserts that his "purported waiver [of the right to counsel] was an incompetent and invalid by-product" of the factors listed above. Appellant's Brief at 18.

The PCRA court denied relief, citing the trial court's two thorough and proper colloquies; crediting defense counsel's PCRA testimony that Appellant understood what was happening at trial and the nature of his offense; and recognizing that this Court had concluded on direct appeal that the trial court did not abuse its discretion in denying Appellant's pretrial request for appointment of new counsel. PCRA Court Opinion, dated 3/25/10, at 8–11 (citing *Spotz II,* 756 A.2d at 1150). We address the four circumstances identified by Appellant in turn, recognizing that each constitutes a separate sub-issue.

With regard to sub-issue (a), Appellant alleges that defense counsel had three conflicts of interest, rendering Appellant's waiver of counsel involuntary. The first alleged conflict was Mr. Blocher's representation of another defendant, whose interests conflicted with Appellant's interests. The potential conflict was addressed in a pretrial hearing held on June 30, 1995. At that time, Mr. Blocher informed the trial court that two individuals, Russell Bloss and Tyrone Lowe, who were imprisoned with Appellant, had made statements to officials from Cumberland County to the effect that they had heard Appellant admit his involvement in the Schuylkill, York, and Clearfield County homicides. N.T. Pre-trial Hearing, 6/30/95, at 2. Mr. Blocher was representing Mr. Bloss at the time he made the statements, although Mr. Blocher was not present when Mr. Bloss spoke with the officials. Mr. Lowe was represented by another attorney in the public defender's office. At the June 30, 1995 hearing, the prosecutor stated that he did not intend to call Bloss or Lowe as witnesses at Appellant's trial. *Id.* at 2–3. Appellant stated that he did not have a problem with Mr. Blocher's representation so long as the public defenders were not "prejudiced" against him. *Id.* at 3. Mr. Blocher stated on the record that he had no prejudice toward Appellant because he had no idea of the

circumstances precipitating the Bloss/Lowe statements or their validity. *Id.* at 3–4. The trial court issued an order permitting Mr. Blocher to remain as Appellant's counsel and finding no conflict of interest so long as the Bloss/Lowe information was not used by the Commonwealth. Neither Mr. Bloss nor Mr. Lowe was called as a witness at Appellant's trial.

The entire matter was raised at the PCRA hearing. During Appellant's direct examination, he confirmed that, at the time of the June 30, 1995 hearing, he was not concerned about the Bloss/Lowe statements, was satisfied with the resolution of the issue, and had no further conversations with counsel concerning this issue. N.T. PCRA Hearing, 6/13/2008, at 790–97. Nonetheless, on cross-examination, Appellant asserted that the Bloss/Lowe statements "prejudiced" his counsel against him. *Id.* at 884. Appellant has not provided the slightest explanation, rationale, or argument as to how or why his view of counsel's response to the statements and attitude toward him changed between the time of the June 30, 1995 pretrial hearing and the time of his trial in April of 1996, creating "one of the big issues" of which he complains. *Id.*

▇ Appellant fails to acknowledge the standard for establishment of a conflict of interest, to wit, that "counsel actively represented conflicting interests, and the actual conflict adversely affected counsel's performance." *Spotz VI,* 18 A.3d at 268 (citation omitted). Appellant proffers only speculation on top of speculation, which cannot come close to meeting this standard. Appellant provides absolutely no indication, much less evidence, that the Bloss/Lowe statements were ever raised again or used in any way by anyone, either in the multiple prosecutions against Appellant or in bargaining for favorable treatment of Mr. Bloss or Mr. Lowe. We have no idea when Mr. Blocher's representation of Mr. Bloss started and when it ceased. Appellant cites no evidence whatsoever that his counsel's performance was in any way affected by the Bloss/Lowe statements. Appellant merely asserts that, be-

cause of the alleged conflict, "counsel did not investigate whether the prosecution had been enlisting prisoners to obtain information about [Appellant], evidence which would have undermined the credibility of Christina Noland and Charles Carothers [and would have] reveal[ed] the extent to which the Commonwealth was willing to go to encourage witnesses to fabricate events and reward versions 'favorable' to its theories." Appellant's Brief at 19. Appellant's allegation is nothing short of wild speculation, unsupported by any facts of record whatsoever. Thus, Appellant has failed to make any showing that his counsel had a conflict of interest with regard to the Bloss/Lowe statements.

■ Appellant's second and third allegations of conflicts with his counsel relate to Mr. Blocher's pretrial notifications to the trial court of Appellant's threats to Ms. Noland and to defense counsel on, respectively, March 14, 1996, and April 3, 1996. Based on this information, the trial court arranged for additional security measures in the courtroom. On direct appeal, Appellant raised a very similar issue, claiming that the trial court abused its discretion in denying his request to appoint new counsel and new standby counsel, based on the same threats and the same alleged conflicts of interest that Appellant asserts here. *See Spotz II*, 756 A.2d at 1149–50. In concluding on direct appeal that the trial court had acted properly in addressing the threats, we recognized that the court had thoroughly evaluated the "potential conflict" and had been assured by Appellant's counsel that they were able to advocate zealously on his behalf. *Id.* at 1150. We then held as follows:

> [T]he "conflict" here resulted from [A]ppellant's own conduct, and the security measures that his purported conduct required. Even if new counsel were appointed, the security concern ... would remain. In response to [A]ppellant's threats and attempts to manipulate, the court took appropriate measures to ensure the safety of counsel and [A]ppellant's right to effective, conflict-free representation. There

was no abuse of discretion by the trial court in refusing to appoint new counsel or new standby counsel for [A]ppellant.

*Id.* at 1150.

Despite our holding on direct appeal, Appellant asserted at the PCRA hearing and maintains here that the same alleged "conflict" due to the same threats rendered his waiver of counsel involuntary. *See* N.T. PCRA Hearing, 6/13/2008, at 809–49; Appellant's Brief at 19–20. As we held on direct appeal, any conflict resulted from Appellant's own conduct, and the trial court responded appropriately to ensure both a safe environment in and around the courtroom, as well as Appellant's right to counsel. Appellant's argument that his waiver of counsel was involuntary because of a conflict with counsel—a "conflict" that **Appellant** created—is circular, self-defeating, and meritless.

Therefore, because none of Appellant's claims as to alleged conflicts with his counsel has any merit, his assertion that his waiver of counsel was involuntary due to conflicts with counsel must fail.

With regard to sub-issue (b), Appellant alleges that his counsel failed to prepare any defense at all, specifically a diminished capacity defense, which "forced" Appellant to proceed *pro se.* Appellant neither presents evidence nor develops an argument to support this contention; he merely directs us to Issue 4. *See* Appellant's Brief at 20–21. Accordingly, we have addressed this claim, and determined it to be meritless, under Issue 4

█ With regard to sub-issue (c), Appellant asserts that his waiver of counsel was involuntary because he was suffering from a variety of mental disorders, including chronic, severe, post-traumatic stress disorder; borderline personality disorder; polysubstance abuse, in remission; and obsessive-compulsive disorder, which were exacerbated by "the extreme stress of a gauntlet of capital trials." Appellant's Brief at 21. Relying primarily on the PCRA testimony of his two mental

health experts, Appellant asserts that he lacked the mental capacity to waive his right to counsel.[6]

We have recently explained the competency standard for waiving the right to counsel as follows.

[T]he competency standard for waiving the right to counsel is precisely the same as the competency standard for standing trial, and is not a higher standard. We have formulated this standard as follows: whether the defendant has the ability to consult with counsel with a reasonable degree of understanding and whether the defendant has a rational understanding of the nature of the proceedings. The focus is properly on the defendant's mental capacity, *i.e.,* whether he or she has the *ability* to understand the proceedings. If a court finds a defendant incapable of waiving the right to counsel, then the court must also conclude that the defendant is incapable of standing trial. Finally, it is important to recognize that a defendant is presumed to be competent to stand trial, and the burden is on the appellant to prove that he was incompetent.

*Spotz VI,* 18 A.3d at 266 (internal citations, quotation marks, and footnote omitted) (emphasis in original).

In denying relief on this sub-issue, the PCRA court applied the proper legal standard, cited the lengthy colloquies conducted by the trial court, and particularly credited the testimony of Appellant's counsel. PCRA Court Opinion at 8–10. We conclude that the PCRA court's ruling is supported by the record and is free of legal error, as we discuss in detail below, starting with a summary of the relevant testimony presented at Appellant's PCRA hearing.

Assistant public defender Smith testified that "[t]here did not appear to be a competency issue" with respect to Appel-

6. Appellant did not raise this issue on direct appeal. However, in *Commonwealth v. Brown,* 582 Pa. 461, 872 A.2d 1139, 1155–56 (2005), a majority of this Court held that "the failure to raise on direct appeal a claim that the appellant was incompetent at the time of trial does not constitute a waiver of that claim for purposes of the PCRA." *See Commonwealth v. Spotz,* 610 Pa. 17, 18 A.3d 244, 262 n. 10 (2011) (*"Spotz VI "*) (discussing *Brown* ). Pursuant to *Brown,* as applied in *Spotz VI,* we shall review Appellant's claim.

lant at the time of trial, as he understood why he was in court, what he was doing, what was going on in court, and the nature of the murder with which he was charged. N.T. PCRA Hearing, 6/9/08, at 298–300. Ms. Smith's testimony was reinforced by that of Appellant himself, who testified that, at the time of trial, he understood the colloquy, he knew where he was, and he knew what was going on around him. *Id.*, 6/13/08, at 876–77.

Stephen Ragusea, Ph.D., a clinical psychologist who interviewed Appellant a few months prior to trial, testified on Appellant's behalf both at the penalty phase of trial and at the PCRA hearing. At the penalty phase, Dr. Ragusea testified that he had been retained by defense counsel to do "a general psychological evaluation [of Appellant] to determine, first of all, whether or not he was competent to stand trial; ... whether or not there was any evidence that he was insane at the time the crime was committed; and ... whether or not there were any possible conditions that might relate to mitigating circumstances." N.T. Penalty Phase, 4/24/96, at 326. Regarding the competency issue, Dr. Ragusea concluded as follows during his penalty phase testimony:

[Appellant] was clearly competent to stand trial. There are criteria that we use to evaluate that, and he was clearly competent to stand trial.

*Id.* at 349.

However, at the PCRA hearing, Dr. Ragusea testified that, if he had known that Appellant was reporting flashbacks to prison mental health professionals just before the trial, he would have suggested a competency evaluation and would have performed such an evaluation if the court had asked him to do so. N.T. PCRA Hearing, 6/12/08, at 645. Neither he nor anyone else suggested how such a competency evaluation would have differed from the evaluation for competency that Dr. Ragusea conducted prior to trial and discussed during his penalty phase testimony. Furthermore, Dr. Ragusea did *not* testify at any time that Appellant was unable either to understand the trial proceedings or to consult with his counsel regarding his defense.

Also at the PCRA hearing, Appellant presented the testimony of two psychiatrists, Robert Fox, Jr., M.D., and Neil Blumberg, M.D., both of whom were retained by PCRA counsel, and both of whom interviewed and evaluated Appellant, and reviewed his records, years after trial. Dr. Fox, who evaluated Appellant in 2000 and 2007 (respectively four and eleven years after Appellant's trial), testified that Appellant suffered from multiple severe psychiatric disorders. N.T. PCRA Hearing, 6/9/08, at 35–40. In Dr. Fox's view, because of Appellant's mental illness, he might easily change his behavior "on a moment[']s notice" from working with his counsel in a reasonable way to turning against them and wanting to fire them. *Id.* at 146. Dr. Fox opined that Appellant "was driven to make the decision to go *pro se* by his personality and the way he was feeling[,] and it was triggered by some actual events." *Id.* at 150. A bit later in his testimony, Dr. Fox opined that Appellant's decision to represent himself was "a product of his mental illness[,] the full totality of it." *Id.* at 152.

Dr. Blumberg, who interviewed Appellant several times in 2006, testified extensively as to Appellant's mental illnesses, opining that Appellant suffered from three different psychiatric conditions; had severely impaired self-esteem; viewed the world in a threatening way; had a hypervigilance deeply ingrained in his personality structure; demonstrated emotional liability and instability and was easily excited or upset; was prone to depression, anger, and quickly shifting emotions; tended to be moody and irritable; overresponded to stressful events; and had longstanding difficulties with impulse control. N.T. PCRA Hearing, 9/18/07, at 315, 409–12. Notably, Dr. Blumberg was not questioned about Appellant's competency to stand trial or waive counsel.[7]

7. However, as this Court has previously recognized and discussed, Dr. Blumberg did offer some insight as to Appellant's competency when he testified as an expert witness on Appellant's behalf at his Cumberland County PCRA hearing in January 2007, approximately eight months prior to Dr. Blumberg's PCRA testimony in the instant case. *See Spotz VI*, 18 A.3d at 267. In his Cumberland County PCRA petition, Appellant contended, exactly as he has done here, that he was not competent to waive his right to counsel. Dr. Blumberg, as well as Dr. Fox,

Importantly, not a single witness opined that Appellant did not have the ability to understand the nature of the proceedings against him, to consult with counsel, or to participate in his own defense. Appellant bears the burden of proving that he was not competent to stand trial or to waive the right to counsel, the standard for which is one and the same. *See Spotz VI, supra,* at 266; *Commonwealth v. Brown,* 582 Pa. 461, 872 A.2d 1139, 1156 (2005). Appellant has not come close to satisfying this standard, and thus we conclude that there is no merit to Appellant's claim that he was not competent to waive counsel.

With regard to sub-issue (d), Appellant asserts that "the [trial] court placed such severe limitations on what [standby] counsel could do that it rendered the appointment of standby counsel meaningless." Appellant's Brief at 24. In particular, Appellant cites the trial court's preclusion of counsel from taking notes, from instigating communications with Appellant, or from offering any arguments on his behalf. *Id.* Appellant asserts that these restrictions "prevented Appellant from adequately presenting proper and viable defenses, legal arguments, and objections;" however, Appellant fails to cite a single specific defense, argument, or objection that he did not proffer or make due to the trial court's limitations on standby counsel. *Id.*

Prior to Appellant's final decision to proceed *pro se,* the trial court clearly delineated standby counsel's role, specifically informing Appellant that standby counsel is not the same as counsel; that if Appellant chose to represent himself, he, not

testified at both the Cumberland County and York County PCRA hearings, and they relied on the same interviews with Appellant in both proceedings.

At the Cumberland County PCRA hearing, Dr. Blumberg testified that he found no evidence to suggest that Appellant was impaired with respect to his ability to understand the questions or the surroundings in the courtroom at the time of trial. *Id.* at 267. Furthermore, Dr. Blumberg testified that Appellant's mental disorders "wouldn't preclude his being able to represent himself and ask direct questions and do cross-examination." *Id.* (quoting N.T. PCRA Hearing in Cumberland County, 1/18/07, at 44–45).

The Cumberland County PCRA court denied relief, and on appeal, we affirmed. *Spotz VI, supra* at 266–67.

his counsel, would be trying the case; that any mistakes he made during his self-representation could not be raised subsequently, as ineffectiveness of counsel was not a legal option on appeal in such circumstances; and that standby counsel cannot "sit there and go over the stuff with you as if they are really counsel but you are asking the questions." N.T. Trial, 4/12/96, at 25–30. The trial court's exhaustive instructions concerning standby counsel's role also included the following excerpts:

> *Court:* [Standby counsel] will advise you [Appellant] as to any legal matters that come up. That's it. They are not trying the case, you [Appellant] are.

*Id.* at 32.

> *Court:* Just so that we understand and you understand, I've given some thought with regard to assistance by [standby] counsel. They can only advise you as to legal matters. Since they are familiar with the exhibits and so forth, they may help you. If you ask for an exhibit, they will give you the exhibit, but that's it, they won't discuss it with you. They won't read through it or tell you to look on [sic] the exhibit. They won't be able to sit and take notes. You'll have to do that on your own.

*Id.* at 36; *see also id.* at 39 (giving in essence the same instructions in shorter form).

This matter of the trial court's limitations on the role of standby counsel was addressed at the PCRA hearing. Mr. Blocher and Ms. Smith both testified that, as standby counsel, their role was limited to answering Appellant's legal questions, and they were not permitted to take notes concerning the trial testimony. N.T. PCRA Hearing, 9/17/07, at 91–92; *id.*, 6/9/08, at 213–17. They were also not permitted to volunteer instructions to Appellant as to what to do next or to volunteer a suggestion that an objection might be warranted. *Id.*, 9/17/07, at 92; *id.*, 6/9/08, at 215–16. Ms. Smith further testified that the court's restriction on note-taking limited her ability to recall guilt-phase testimony and its potential relevance to evidence of mitigation during the penalty phase; however, she did not specify any particular instance in which her inability to

recall the testimony affected her performance during the penalty phase or at any other time. *Id.*, 6/9/08, at 217.

The PCRA court concluded that there was no merit to Appellant's claim that the trial court improperly limited standby counsel's role. PCRA Court Opinion at 11. Noting that Appellant cited no supporting legal authority for his assertions of trial court error, the PCRA court relied on Pennsylvania Rule of Criminal Procedure 121(D) to conclude that the trial court had properly instructed standby counsel. Furthermore, the PCRA court determined that standby counsel offered assistance when Appellant asked, provided him with documents, and discussed trial strategy, all of which were in accord with the proper role of standby counsel. *Id.* (citing N.T. PCRA Hearing, 6/9/07, at 292–94 (cross-examination of Ms. Smith)).

As the Commonwealth correctly points out, Appellant has waived this sub-issue of trial court error. Our review of the record reveals no instance—and Appellant fails to indicate any instance—where any objection was made to the trial court's delineation of standby counsel's role. Nor was this issue raised on direct appeal. As the claim of trial court error has been waived, the only cognizable claim in this matter is a claim of ineffective assistance of counsel for failing to object to the trial court's limitations on standby counsel's role. After thorough review, we conclude that there is no arguable merit to Appellant's ineffectiveness claim, because the trial court acted within its discretion in restricting standby counsel's role, and counsel is not ineffective for failing to raise a meritless objection.

In *Faretta v. California*, 422 U.S. 806, 834 n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), the United States Supreme Court determined that a state "may ... appoint a 'standby counsel' to aid the accused if and when the accused requests help, and to be available to represent the accused in the event that termination of [his or her] self-representation is necessary." This Commonwealth's Rules of Criminal Procedure provide for the appointment of standby counsel as follows:

**(D) Standby Counsel.** When the defendant's waiver of counsel is accepted, standby counsel may be appointed for the defendant. Standby counsel shall attend the proceedings and shall be available to the defendant for consultation and advice.

Pa.R.Crim.P. 121(D).

Although neither the United States Supreme Court nor our Rules of Criminal Procedure mandate the appointment of standby counsel, a comment to Rule 121 suggests the advisability of appointing standby counsel to attend the proceedings and be available to the defendant for consultation and advice when the defendant has waived his right to counsel for a trial, especially in long or complicated cases. *See also Commonwealth v. Szuchon,* 506 Pa. 228, 484 A.2d 1365, 1376–77 (1984), *abrogated on other grounds, Commonwealth v. Lucarelli,* 601 Pa. 185, 971 A.2d 1173, 1179 (2009), (noting that it is "strongly advisable, especially in a potential death penalty case, that the trial judge appoint 'standby' counsel").

Most relevant here, the appointment of standby counsel does **not** imply or authorize some sort of hybrid representation. *See Commonwealth v. Ellis,* 534 Pa. 176, 626 A.2d 1137, 1138–39 (1993) (agreeing with the Superior Court that "there is no right of self-representation together with counseled representation ('hybrid representation') . . . although standby counsel may be appointed to give the defendant legal advice."). When a defendant elects to proceed at trial *pro se,* the defendant—and not standby counsel—is in fact counsel of record and is responsible for trying the case. This understanding of the limited role of standby counsel is essential to satisfy the United States Supreme Court's directive that a defendant's choice to proceed *pro se* "must be honored out of 'that respect for the individual which is the lifeblood of the law' " even when the defendant acts to his or her own detriment. *Faretta, supra* at 834, 95 S.Ct. 2525. This understanding also underlies our prior holding that a defendant who chooses to represent himself cannot obtain relief by raising a claim of ineffectiveness of counsel or standby counsel. *Spotz*

*VI, supra* at 270 (citing *Commonwealth v. Fletcher,* 604 Pa. 493, 986 A.2d 759, 774 (2009)).

The trial court's directives as to the role of standby counsel in the instant case reflected a proper understanding of these principles. Consistently with the PCRA court, we conclude that the trial court did not err or abuse its discretion in setting forth its restrictions on standby counsel's role. Accordingly, there is no arguable merit to Appellant's claim of ineffective assistance of counsel for failing to object to those restrictions, and he is entitled to no relief.

In sum, with regard to Issue 1, Appellant's multi-pronged challenge to his waiver of the right to counsel, we conclude that there is no merit to any of Appellant's allegations or arguments. After careful review, we affirm the rulings of the PCRA court because they are supported by the record and are free of legal error.

### Issue 2: Disclosure of Impeachment Evidence against Ms. Noland

In Issue 2, Appellant asserts that his due process rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution were violated when the Commonwealth failed to disclose the terms of an alleged agreement reached with Ms. Noland whereby, in exchange for her trial testimony against Appellant, the charges against her would be reduced and she would receive lenient sentences.[8] Appellant's Brief at 26 (citing *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *Kyles v. Whitley,* 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); *Giglio v. United States,* 405 U.S. 150, 153–55, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972)). The Commonwealth disputes the existence of such an agreement, and the PCRA court concluded

8. Appellant also asserts that his right to confrontation of the witness was violated. Appellant's Brief at 26. Because Appellant does not make a distinct and separate argument for this assertion, we likewise do not address it separately from his other claims in this issue.

200

that Appellant had proffered no evidence to establish its existence. PCRA Court Opinion at 11–13.[9]

Under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and subsequent decisional law, a prosecutor has an obligation to disclose all exculpatory information material to the guilt or punishment of an accused, including evidence of an impeachment nature. *See, e.g., Commonwealth v. Strong,* 563 Pa. 455, 761 A.2d 1167, 1171 & n. 5 (2000). To establish a *Brady* violation, an appellant must prove three elements: (1) the evidence at issue is favorable to the accused, either because it is exculpatory or because it impeaches; (2) the evidence was suppressed by the prosecution, either willfully or inadvertently; and (3) prejudice ensued. *Commonwealth v. Lambert,* 584 Pa. 461, 884 A.2d 848, 854 (2005). We stress that the burden rests with the appellant to "prove, by reference to the record, that evidence was withheld or suppressed by the prosecution." *Commonwealth v. Porter,* 556 Pa. 301, 728 A.2d 890, 898 (1999). The evidence at issue must have been "material evidence that deprived the defendant of a fair trial." *Commonwealth v. Johnson,* 572 Pa. 283, 815 A.2d 563, 573 (2002). "Favorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Kyles v. Whitley,* 514 U.S. 419, 433, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995))

*Brady* evidence encompasses information as to any potential understanding between the prosecution and a witness because such information is relevant to the witness's

9. The PCRA court also recognized that Appellant had raised, unsuccessfully, a similar claim in his collateral appeal from his Schuylkill County first-degree murder conviction. PCRA Court Opinion at 12–13 (citing *Spotz V,* 896 A.2d at 1214–17). In *Spotz V, supra* at 1217, this Court concluded that Appellant had presented no evidence to support his claim that Ms. Noland had entered into an agreement with the Commonwealth whereby she would testify against Appellant in his Schuylkill County murder trial in exchange for a more lenient sentence.

credibility and may be used for impeachment. *Spotz V, supra* at 1214; *Strong, supra* at 1171–72. "Impeachment evidence which goes to the credibility of a primary witness against the accused is critical evidence and it is material to the case [even when] that evidence is merely a promise or an understanding between the prosecution and the witness." *Id.* (quoting *Strong, supra* at 1175). Thus, to qualify as *Brady* evidence, an agreement between the prosecution and a witness need not be a formal, signed document, but may be simply a promise or an understanding that the prosecution will extend leniency and favorable treatment in exchange for a witness's testimony. *Strong, supra* at 1175.

■ For Appellant to obtain collateral relief on this *Brady* claim, he must prove by a preponderance of the evidence that an agreement between the Commonwealth and Ms. Noland existed and that the failure to disclose the agreement so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place. *Strong, supra* at 1171; 42 Pa.C.S. § 9543(a)(2)(i).

To resolve the specific claim that Appellant raises here, we must first set forth the relevant facts in detail. In February 1995, Ms. Noland was charged by the York County District Attorney with first-degree murder, second-degree murder, kidnapping, robbery of motor vehicle, unlawful restraint, theft by unlawful taking, receiving stolen property, and criminal conspiracy.[10] The Commonwealth filed notice to consolidate Ms. Noland's trial and Appellant's trial. However, Ms. Noland became a Commonwealth witness and testified against Appellant. Just prior to Ms. Noland's testimony at Appellant's trial, the following comments were made to the jury.

*Court:* Before the next witness [Noland] is called, ladies and gentlemen, I'll advise you that I've been advised by the Commonwealth that this witness, they [sic] will not be seeking either first degree or second degree murder. They

10. Respectively, 18 Pa.C.S. §§ 2502(a), 2502(b); 2901(a)(2), (3); 3702(a); 2902(a)(1); 3921(a); 3925(a); and 903.

will not be seeking a jury to convict her of either first or second degree murder.

*Prosecutor:* I think the record should reflect otherwise there is no agreement as to sentence as to the other offenses if she is convicted. But as to **second and first degree murder, there is an agreement that the Commonwealth will not pursue those two charges.**

N.T. Trial, 4/13/96, at 208 (emphasis added).

Immediately after these comments, Ms. Noland testified extensively as to her three-day crime spree with Appellant, directly implicating him as the one who shot and killed Ms. Gunnet. During cross-examination, Appellant repeatedly asked Ms. Noland if she was testifying in order to get "some kind of deal" with the Commonwealth, but she consistently denied any deal. *Id.* at 313–19. The essence of Appellant's defense was an attempt to place blame for the murder on Ms. Noland. *Id.* at 393. In his closing argument, Appellant returned to the matter of a "deal" between Ms. Noland and the Commonwealth with the following comments:

You heard testimony which was a stipulation from the District Attorney's Office themselves that Christine Noland was never subjected to face the death penalties. That she was charged with criminal homicide which included first-, second-, and third-degree murder.[11]

The [D]istrict [A]ttorney told you that they have dropped first-degree murder. They have dropped second-degree murder. The very most she can get is third-degree murder. Christine Noland doesn't have to worry about facing the death penalty or face spending the rest of her life in prison with no parole. She knows she is going to go home someday.[12]

\* \* \*

11. Contrary to Appellant's statement, Ms. Noland was not charged with third-degree murder in York County.

12. The prosecutor objected to Appellant's comment on sentencing, stating that the court had complete discretion with regard to sentencing, and the total maximum sentence for all the crimes with which Noland was charged exceeded her lifetime. N.T. Trial, 4/22/96, at

The defense position is that the evidence shows Christine Noland's testimony isn't the truth. She testified so that she would not do life in exchange for gifts and favoritism from the [D]istrict [A]ttorney. Despite the minor things, sneakers, necklaces, and going out to eat, the major deal was no death penalty, no life, no first-degree, no second-degree murder.

The testimony—her testimony is given so she can stay alive. The defense's position is that it's not hard to believe Christine Noland is putting this all on me so she can say this a[sic]—so she can stay alive or not do life in prison.

N.T. Trial, 4/22/96, at 1926, 1928–29 (footnotes added).

Appellant was found guilty of first-degree murder in York County on April 22, 1996. On June 20, 1996, Ms. Noland pled guilty to kidnapping, robbery, and conspiracy to commit murder. Sentencing was set for August 12, 1996, but prior to sentencing, she sought to withdraw her guilty plea. The trial court granted her motion on April 28, 1997, and the Superior Court affirmed.[13] *Commonwealth v. Noland,* 718 A.2d 346 (Pa.Super.1998).

The Commonwealth then restarted its efforts to bring Ms. Noland to trial, including on capital murder charges. *See* Commonwealth's Petition to File Notice of Aggravating Circumstances, dated 12/11/98 (Defendant's PCRA Exhibit 41). In this petition, the Commonwealth explained that it had not previously filed a notice of aggravating circumstances against Ms. Noland because of an agreement with her. The Commonwealth set forth the terms of this agreement as follows: "That

1926–27. In response, the court simply stated that it would charge the jury with regard to the maximum sentences. *Id.* at 1927.

13. In granting Noland's motion to withdraw her guilty plea, the trial court concluded as follows: "Here, the Commonwealth chose to try Mark Spotz [Appellant] alone, without having secured a plea of guilty from Defendant Noland. In doing so, the Commonwealth must have contemplated the possibility that a separate trial of defendant Noland would be necessary if Noland did not enter a plea of guilty after the trial of Spotz and the Commonwealth cannot now claim that it is prejudiced by the prospect of that trial." *Commonwealth v. Noland,* No. 1448 CA 1995, Opinion, filed 4/28/97, at 4 (York County Court of Common Pleas) (Defendant's PCRA Exhibit 42).

in consideration of [Ms. Noland's] commitment to cooperate and testify against her co-defendant [Appellant], the Commonwealth did not seek the death penalty [against her] and agreed to accept pleas of guilty to lesser charges." *Id.* at ¶ 7.

From the facts of record summarized above, we conclude the following. (1) There was an agreement between the Commonwealth and Ms. Noland. (2) Pursuant to that agreement, the Commonwealth agreed not to prosecute Ms. Noland for first- or second-degree murder; and Ms. Noland agreed to testify against Appellant and plead guilty to lesser charges. (3) The prosecutor explicitly advised the jury of the Commonwealth's agreement not to pursue first- or second-degree murder charges. (4) The prosecutor also advised the jury that there was no agreement as to Ms. Noland's sentence for the other offenses with which she was charged. (5) Emphasizing the Commonwealth's agreement not to pursue first- or second-degree murder charges against Ms. Noland, Appellant strenuously argued that her testimony was given solely so that she could stay alive, not be subject to the death penalty, and not spend the rest of her life in prison.

In his brief to this Court, Appellant now asserts the following concerning the agreement between Ms. Noland and the Commonwealth: "The jury was never told that Noland had agreed to plead to lesser charges *in exchange for her testimony.* The clear implication left with the jury was that the prosecution had determined that these higher degrees of murder were not sustainable against Noland." Appellant's Brief at 26 (emphasis in original). With these assertions, Appellant misconstrues the record in at least two ways.

First, Appellant simply ignores the prosecutor's clear statement to the jury that there was an **agreement** with Ms. Noland as to first- and second-degree murder charges: *See* N.T. Trial, 4/13/96, at 208 ("But as to second and first degree murder, there is an **agreement** that the Commonwealth will not pursue those two charges.") (emphasis added). The record thus completely belies Appellant's assertion that the jury was not clearly informed of the existence of an agreement between the Commonwealth and Ms. Noland. Appellant's

claim that the prosecutor implied to the jury that murder charges were not sustainable against Ms. Noland is completely refuted by the prosecutor's statement of record.

Second, Appellant's focus on Ms. Noland's subsequent guilty pleas to lesser charges is misplaced, and his additional claim that the Commonwealth had agreed to seek lenient sentences for these lesser charges is completely unsupported by any evidence whatsoever. The only benefit accruing to Ms. Noland from her agreement with the Commonwealth was freedom from prosecution for first- or second-degree murder. In return, she agreed to testify against Appellant and to enter guilty pleas to lesser charges. The agreement between the Commonwealth and Ms. Noland encompassed the lesser charges only insofar as she agreed to plead guilty to them rather than be subject to trial. There is no evidence whatsoever that the Commonwealth ever agreed to forego prosecution of Ms. Noland for the lesser charges or had promised her a lenient sentence.[14] Following Ms. Noland's trial testimony against Appellant, her guilty plea to lesser charges, and the court's grant of her request to withdraw those guilty pleas, the Commonwealth restarted its efforts to bring her to trial, including on capital murder charges. Appellant's convoluted and unsupported argument focusing on the significance of the lesser charges and the sentence for those charges is meritless.

Thus, in sum, we conclude as follows. There was an agreement between the Commonwealth and Ms. Noland, and the relevant terms of this agreement were announced in court in the presence of the jury. Furthermore, Appellant used the

14. In fact, evidence proffered by Appellant in *Spotz V*, 896 A.2d at 1216–17, his Schuylkill County PCRA appeal, refutes his assertion that the Commonwealth promised Ms. Noland a lenient sentence. In *Spotz V*, Appellant proffered a transcript of Ms. Noland's testimony at a hearing held in York County on October 7, 1996, to consider her petition to withdraw her guilty plea. *Id.* At that hearing, Ms. Noland testified that she had no idea how long her sentence could possibly be at the time she pled guilty, and she confirmed that the prosecutor never made any promises to her about her sentence. *Id.* As we concluded in *Spotz V, supra* at 1217, Appellant "has not presented this Court with any evidence that Noland and the Commonwealth had entered into an agreement whereby Noland would testify against [Appellant] in exchange for a more lenient sentence."

terms of the agreement in an attempt to impeach Ms. Noland. There is absolutely no merit to Appellant's claim of a *Brady* violation with regard to the agreement between the Commonwealth and Ms. Noland.

## Issue 3: Disclosure of Impeachment Evidence against Carlos/Charles Carothers

In Issue 3, Appellant raises a second *Brady* claim, this one concerning an alleged agreement between the Commonwealth and another witness for the prosecution, Carlos/Charles Carothers.[15] The factual background to this claim is as follows. Mr. Carothers testified at Appellant's trial that he and Appellant met in Carlisle, in Cumberland County, early in the morning of February 3, 1995, the day after Ms. Gunnet was murdered. At that time, Mr. Carothers testified, Appellant stated that he "had shot his brother and killed these other ladies," and "threw one lady off a bridge, and the other lady he ran over with her car and she got stuck under it." N.T. Trial, 4/16/96, at 1031. In addition, Carothers testified about a gun, ammunition, credit cards, rings, clothing, and cash in Appellant's possession, and about a wound on Appellant's leg. *Id.* at 1031–36, 1039–40.

The prosecutor questioned Mr. Carothers about any possible plea deal as follows:

> *Prosecutor:* Am I correct, Mr. Carothers, that you are currently incarcerated in Cumberland County Prison for a charge of possession of drugs with intent to deliver?
>
> *Carothers:* Delivery charge.
>
> *Prosecutor:* Delivery of drugs?

15. In the instant York County collateral appeal, Mr. Carothers is referred to as "Carlos Carothers" in the notes of testimony. *See* N.T. PCRA Hearing, 6/11/08, at 462. However, in the same notes of testimony, reference is made to a declaration that was signed by Mr. Carothers as "Charles L. Carothers." *Id.* at 481–82; Declaration of Charles Lee Carothers, Jr., dated 2/1/07 (Defense PCRA Exhibit 75). At trial, Mr. Carothers was called "Charles Carothers." N.T. Trial, 4/16/96, at 1021. In Appellant's Cumberland County collateral appeal, Mr. Carothers was referred to as "Charles Carothers." *See Spotz VI, supra* at 269. It is clear from the record that Carlos Carothers and Charles Carothers are one and the same person.

*Carothers:* Yes.

*Prosecutor:* Are you testifying today pursuant to the terms of any kind of plea agreement that you have with the County of York or the County of Cumberland?

*Carothers:* No.

*Prosecutor:* Nobody has offered to give you any kind of deal in return for your testimony?

*Carothers:* No.

*Id.* at 1038–39.

Appellant claims that the above testimony was false, and that Mr. Carothers had made a "deal" with the Commonwealth to avoid prosecution for two other murders, to wit, the murder of Betty Amstutz in Cumberland County, for which Appellant was ultimately convicted; and the unrelated murder of one Samuel "Doc" Thompson, for which another individual had been convicted two years before Appellant's arrest.,[16], [17] Appellant's Brief at 30–31. To support these assertions, Appellant relies on Mr. Carothers's testimony at Appellant's PCRA hearing, during which Carothers recalled that when a detective investigating Appellant's case made reference at one point to the Thompson murder, it made him "feel nervous." N.T. PCRA Hearing, 6/11/08, at 483–84. However, Mr. Carothers also testified that he "wasn't really concerned about [the Thompson murder case, which] was over and done with" and for which he already had "a deal in place." *Id.* at 485.

16. In Appellant's collateral appeal of his first-degree murder conviction in Cumberland County, he also raised a *Brady* claim concerning the involvement of Carothers in the murder of Thompson. *See Spotz VI,* 18 A.3d at 277. On appeal, we held that the involvement of Carothers in the murder of Thompson was "a matter of pure conjecture[, as Carothers] was not arrested for, not charged with, not tried for, not convicted of" that murder. *Id.*

17. The Amstutz murder and the Thompson murder took place in Cumberland County, where they were prosecuted. Appellant provides no evidence to indicate that the York County District Attorney's Office had any authority to make agreements regarding prosecution or lack thereof in these Cumberland County cases. To the contrary, Christy Fawcett, one of the York County prosecutors in Appellant's case, testified at his PCRA hearing that she had authority to make agreements only with respect to York County charges. N.T. PCRA Hearing, 6/11/08, at 439.

Mr. Carothers also testified that the prosecutor in Appellant's case told him that if he was "truthful," then he would have "nothing to worry about." *Id.* at 486. PCRA counsel pursued this line of questioning as follows:

> *PCRA Counsel:* Well, I am saying as long as you cooperate and tell us what you know, we won't bring any charges, is that how you understood?
>
> *Carothers:* I am not sure if the word was cooperation, but just to be forthcoming and honest maybe.

*Id.* at 486.

Appellant also cites a document entitled Declaration of Charles Lee Carothers, Jr., dated 2/1/07, (Defense PCRA Exhibit 75) (hereinafter "Carothers Declaration"), as further support for his claim. This declaration was prepared by Appellant's PCRA counsel when he visited Mr. Carothers in prison, and it was signed by Mr. Carothers. N.T. PCRA Hearing, 6/11/08, at 481–82, 489–90. The declaration states that Carothers was nervous when the detectives mentioned the Thompson murder because Carothers "took it as a warning to cooperate in the Spotz case." Carothers Declaration at 2. In addition, the declaration states that the York County prosecutor told Carothers that so long as he cooperated and told the prosecutor what he knew, he would not be charged. *Id.* In his PCRA testimony, Carothers stated that he did not believe that he read the declaration before signing it. N.T. PCRA Hearing, 6/11/08, at 490. In addition, Carothers testified as follows with regard to the declaration.

> I don't remember actually reading [it]. I remember you [Appellant's PCRA counsel] asking me to sign it. I was under the impression that what you wanted me here for was to simply, you know, tell that [Appellant] was getting high. I didn't realize you were going to try to distort it or twist it to turn it, once again, back at me. So, I didn't think it was necessary to read what you wrote.

*Id.*

Mr. Carothers's testimony and the Carothers Declaration are the sum total of support that Appellant cites for his claim

that the Commonwealth failed to disclose a "deal" with Mr. Carothers, in violation of *Brady*. This evidence does not come close to establishing that there was an agreement between Mr. Carothers and the Commonwealth whereby Carothers agreed to testify against Appellant at trial and the Commonwealth agreed not to prosecute Carothers. Appellant's assertions of a deal are speculative and focus on relatively small inconsistencies between Carothers's testimony at the PCRA hearing and the Carothers Declaration, which Carothers signed but apparently did not read. Appellant has proffered no evidence that the Commonwealth entered into an agreement or made a deal in exchange for Carothers's testimony against Appellant. Because Appellant has not met his burden to establish that an agreement existed, his *Brady* claim based on the existence of such an agreement has no merit.[18]

## Issue 4: Diminished Capacity Guilt–Phase Defenses

In Issue 4, Appellant asserts that his counsel were ineffective for failing to investigate and develop the guilt-phase defense of diminished capacity due to mental defect or voluntary intoxication. In addition, as we discussed briefly under

---

**18.** In Appellant's Statement of Questions Presented, *see* Appellant's Brief at 1, Issue 3, he also avers that the Commonwealth "in bad faith destroyed its notes of its interview with Carothers in which the offer had been tendered." Appellant's "development" of this issue consists, in its entirety, of the following two sentences set forth in a footnote:

Ms. Fawcett [one of the York County prosecutors in Appellant's case] testified she could not recall the details of the Carothers interview. She conceded that she "probably" took notes of the interview, NT [PCRA Hearing] 6/9–13/08, 430, but indicated that the notes were likely destroyed and claimed she had no burden to retain them because they were work-product. [*Id.*]

Appellant's Brief at 31 n. 19.

PCRA counsel referred to the notes several times in his questioning of Ms. Fawcett. *See* N.T. PCRA Hearing, 6/11/08, at 430–32, 434, 440–41, 445. Ms. Fawcett testified that her notes were likely destroyed when she left the district attorney's office, but that, in any event, she was not required to disclose them because they were attorney work product. *Id.* at 430–31. Appellant's bald assertions that the notes contained information relevant to an alleged offer extended to Carothers and were destroyed in bad faith by the Commonwealth are nothing short of rank speculation, supported by no evidence whatsoever. Because Appellant fails to present any facts, any argument, or any citation to authority with respect to this sub-claim, it is not reviewable.

sub-issue 1(b), Appellant contends that his counsel's alleged failure to prepare this defense "forced" him to proceed *pro se*.[19] Appellant's Brief at 20–21, 32–34. The PCRA court denied relief, crediting the testimony of trial counsel at the PCRA hearing and holding that there was no evidence to support a diminished capacity defense. PCRA Court Opinion at 13–14. The PCRA court specifically noted trial counsel's testimony that they did not recall Appellant *informing them* that he had used any drugs during the time of Ms. Gunnet's murder. Finally, the PCRA court recognized that a diminished capacity defense was not available to Appellant because he maintained his innocence of the murder of Ms. Gunnet throughout trial.[20] *Id.*

We have recently summarized the law relevant to the defense of diminished capacity due to mental defect or voluntary intoxication as follows:

> A defense of diminished capacity, whether grounded in mental defect or voluntary intoxication, is an extremely limited defense available only to those defendants who admit criminal liability but contest the degree of culpability based upon an inability to formulate the specific intent to kill. Absent an admission from the defendant that he had shot and killed the victim, trial counsel could not have presented a diminished capacity defense. If a defendant does not admit that he killed the victim, but rather advances an innocence defense, then evidence on diminished capacity is inadmissible.

19. Appellant raised similar issues in the collateral appeals of his Cumberland County and Schuylkill County murder convictions. *See Spotz VI*, 18 A.3d at 264–65, and *Spotz V*, 896 A.2d at 1217–19, respectively. In both of these cases, the PCRA court rejected Appellant's claims, and we affirmed.

20. The Commonwealth argues that Appellant is precluded from raising an ineffectiveness claim related to the failure to present a diminished capacity defense because he represented himself during the guilt phase of trial. However, Appellant's ineffectiveness claim focuses on the investigation of a diminished capacity defense, which would have occurred during the pre-trial period, when Appellant was represented by counsel. Accordingly, we do not conclude that this claim is barred by Appellant's self-representation during the guilt phase of trial.

A diminished capacity defense does not exculpate the defendant from criminal liability entirely, but instead negates the element of specific intent. For a defendant who proves a diminished capacity defense, first-degree murder is mitigated to third-degree murder. To establish a diminished capacity defense, a defendant must prove that his cognitive abilities of deliberation and premeditation were so compromised, by mental defect or voluntary intoxication, that he was unable to formulate the specific intent to kill. The mere fact of intoxication does not give rise to a diminished capacity defense. [Rather, a defendant must] show that he was overwhelmed to the point of losing his faculties and sensibilities to prove a voluntary intoxication defense. Evidence that the defendant lacked the ability to control his or her actions or acted impulsively is irrelevant to specific intent to kill, and thus is not admissible to support a diminished capacity defense. Furthermore, diagnosis with a personality disorder does not suffice to establish diminished capacity.

In numerous prior cases before this Court, defendants who had maintained their innocence during trial have subsequently raised post-conviction claims of ineffective assistance of trial counsel for failure to present and/or to investigate a defense of diminished capacity. We have consistently declined to hold that trial counsel was ineffective for failing to advance a defense that directly and irreconcilably conflicted with the accused's claims of innocence..... [Furthermore, as we have recently stated,] whether addressing a claim of counsel's failure to investigate or failure to present a diminished capacity defense, this Court has employed the same analysis.

Finally, we have held that the authority to concede criminal liability and to authorize the presentation of a diminished capacity defense rests **solely** with the accused. [E]ven if diminished capacity [were] the only viable defense, trial counsel would be deemed ineffective for presenting this defense without the consent of the defendant[ ].

*Commonwealth v. Hutchinson,* 611 Pa. 280, 25 A.3d 277, 312–13 (2011) (internal citations and quotation marks omitted) (emphasis in original).

 In the instant case, this issue was the subject of extensive testimony at Appellant's PCRA hearing. To support his claim that trial counsel were ineffective for failing to investigate and develop a defense of diminished capacity due to voluntary intoxication, Appellant cites the PCRA testimony of numerous witnesses who presented evidence concerning his chronic and acute drug use, as we summarize in the paragraph below. It is important to emphasize that **none** of the witnesses who testified at the PCRA hearing actually saw Appellant or had information as to his drug use at the time of Ms. Gunnet's murder, which is the only time that is relevant.

For example, Cindy Queen, the mother of one of Appellant's children, testified that Appellant was a chronic user of a variety of drugs, which left him irritable, moody, anxious, and changed from the caring and kind person that she knew; however, the last time she saw Appellant was three to four days prior to Ms. Gunnet's murder. N.T. PCRA Hearing, 9/17/07, at 242–47, 252. Another witness, Sheldon Brooks, testified that he saw Appellant, whom he did not know at the time, using cocaine at a "crack house" in Carlisle beginning around 8:00 or 9:00 p.m. on the day of Ms. Gunnet's murder. *Id.,* 6/10/08, at 366–72. In Mr. Brooks's opinion, Appellant was "really strung out" that evening. *Id.* at 368. However, as we mentioned above, Ms. Gunnet was murdered early in the morning of February 2, 1995, so Brooks's observations were made at least thirteen or fourteen hours after the murder. Similarly, Charles/Carlos Carothers testified that he saw Appellant use cocaine repeatedly to get "high" during the evening of February 2, 1995, and into the early morning hours of the next day. *Id.,* 6/11/08, at 462–66, 493. Finally, Juan Maldanado, an acquaintance of Appellant's, testified that Appellant came to the parking lot where Mr. Maldanado worked in Harrisburg, "about 9:15 in the morning [-] sometime in the morning" of February 2, 1995. *Id.,* 6/12/08, at 691–92, 694–95. Mr. Maldanado opined that Appellant appeared from his demeanor to be high on drugs; however, Maldanado had consid-

erable difficulty explaining exactly what aspects of Appellant's demeanor or behavior led him to this conclusion. Mr. Maldanado did recall that Appellant was talking and walking; was able to climb over a seven-foot fence with Maldanado, even though he had wounds on the leg and shoulder; had Maldanado look at and help clean his shoulder wounds; and eventually departed by walking down the street. *Id.* at 696–97, 702–04. In addition, Mr. Maldanado testified that Appellant stated that he was wanted in Schuylkill County for murder and he showed Maldanado a gun, which, Appellant commented, was "dropping them like flies." *Id.* at 704–05. Finally, Mr. Maldanado testified that Appellant also showed him some women's rings and credit cards that he was attempting to sell; Maldanado recalled that Appellant asked if Maldanado could find someone who could "use" a woman's credit cards.[21] *Id.* at 702–03.

**21.** Mr. Maldanado testified for the Commonwealth at Appellant's trial, and his testimony at that time was similar in many respects to his PCRA testimony. Specifically, Mr. Maldanado testified that Appellant had in his possession, on the morning of February 2, 1995, women's rings and credit cards; that Appellant was attempting to find a woman to help him use the credit cards to buy items; that Maldanado had offered to buy the rings, but Appellant did not wish to sell them for less than fifty dollars; that Appellant also had a gun in his possession, regarding which he commented that it was "dropping them like flies;" that Appellant sought Maldanado's help for a bullet wound in the leg and two stab wounds in the back and shoulder, but would not go to the hospital because he was "wanted" for homicide in Schuylkill County; that, despite his wounds, Appellant "was walking okay;" and that Appellant was clean and shaven. N.T. Trial, 4/16/96, at 991–97.

However, in his trial testimony, Mr. Maldanado neither mentioned any drug or alcohol use by Appellant nor suggested that he was mentally impaired or incapacitated in any way. In fact, on cross-examination, when Appellant asked Maldanado if Appellant was unaffected by his wounds, Maldanado answered as follows:

You [Appellant] was walking okay. We climbed over that fence, and you shook my hand okay. It didn't seem to me that you were affected by it [the gunshot and stab wounds].

*Id.* at 1008.

Maldanado's trial testimony was generally consistent with a statement he made to police on February 17, 1995. *See* General Investigation Report, Trooper Stephen J. Caruso, dated 2/17/95 (cited in Appellant's Brief at 33 as Defendant's Exhibit 98). However, in his statement to police, Maldanado relayed not only Appellant's statement that he was wanted in Schuylkill County for murder, but also another statement that Appellant had "'emptied a clip' into another person." *Id.* at 1.

None of this testimony remotely suggests that Appellant was at all intoxicated by drugs or alcohol **at the time** of Ms. Gunnet's murder, much less that he was so intoxicated as to be overwhelmed to the point of losing his faculties and sensibilities and unable to formulate a specific intent to kill. *See Hutchinson, supra.* In fact, the testimony of Mr. Maldanado, who apparently saw Appellant a few hours after Ms. Gunnet's murder, indicates that Appellant was sufficiently in control of his faculties and sensibilities to seek out and speak with Maldanado at his workplace; to get around on foot and climb over a seven-foot fence, despite his injuries; to try to get his wounds cleaned with Maldanado's help; to recall that he was wanted in Schuylkill County for murder via the use of a gun in his possession; to make a crude comment about how the gun had been used; and to attempt to sell women's rings and credit cards. Thus, the witnesses' testimony summarized above either is not relevant to a voluntary intoxication defense or actually refutes such a defense.[22]

Both of Appellant's trial counsel, *i.e.,* Mr. Blocher and Ms. Smith, testified at the PCRA hearing concerning their consideration of a diminished capacity defense, and nothing in their testimony suggests that they failed to investigate Appellant's

Thus, Mr. Maldanado's trial testimony and pre-trial statement to police, like his PCRA testimony, did not in any way suggest an image of Appellant as one who was intoxicated such that he was "overwhelmed to the point of losing his faculties and sensibilities." *Hutchinson,* 25 A.3d at 312.

**22.** Appellant also cites the testimony or statements of four other individuals to support his claim. *See* Appellant's Brief at 32–33. This evidence is likewise not relevant to a voluntary intoxication defense. At Appellant's PCRA hearing, Detective Jeffrey Franks testified that he recognized as drug paraphernalia certain items that were recovered from the ceiling of the hotel room where Appellant was apprehended. N.T. PCRA Hearing, 6/10/08, at 309–15. Also at the PCRA hearing, Daniel Hogan testified that he regularly used drugs with Appellant and saw Appellant use marijuana, cocaine, acid, and alcohol on multiple occasions; however, Hogan last saw Appellant either three or four days, or perhaps a couple of weeks, before the murders. *Id.,* 6/13/08, 711–20. Finally, Appellant cites statements of Malissa Chirdon and Linda Chirdon, neither of whom testified at the PCRA hearing. Their statements are not included in the record, but from Appellant's summary, it is clear that neither individual had information as to Appellant's drug or alcohol use at the time of the murders.

drug use or possible mental defect as potential support for such a defense. When Ms. Smith was questioned as to whether she had taken statements concerning Appellant's drug use from the witnesses whose PCRA testimony is summarized *supra*, she replied as follows:

> Unfortunately, these individuals were not all with him during the course of th[e] time frame [of the murder]. And so, we were limited on what they could actually say about the time frame of the shooting. . . .

N.T. PCRA Hearing, 6/10/08, at 305–06.

Although Ms. Smith and Mr. Blocher did not have a precise or completely consistent recollection as to what Appellant himself had told them about his drug and alcohol use during the time frame of the murders, *see id.* at 289–91; *id.*, 9/17/07, at 196–97, 199, 216, their testimony indicates that they investigated the possibility of an involuntary intoxication defense sufficiently to realize that there was no evidentiary support for such a defense.

Prior to trial, defense counsel had retained Dr. Ragusea as a psychologist expert witness, and Mr. Blocher testified that Appellant's possible mental health defects or diseases were "the kinds of things [that] we were looking for." N.T. PCRA Hearing, 9/17/07, at 104, 235. Ms. Smith testified that conversations with Dr. Ragusea indicated that there was insufficient evidence to raise diminished capacity even as a mitigating factor, much less as a guilt-phase defense. *Id.*, 6/9/08, at 209–10; *id.*, 6/10/08, at 286–87. In addition, Ms. Smith did not recall any time at which Appellant had indicated that he suffered from any kind of hallucinations or flashbacks, or that he had any untreated mental illness. *Id.*, 6/10/08, at 295–96.

Defense counsel testified that they had discussed possible defenses with Appellant, including a diminished capacity defense, and that Appellant supported the decision to try to shift blame for the murder onto Christina Noland, a defense that Appellant ultimately employed during his self-representation. *Id.* at 287–91; *id.*, 9/17/07, at 196–97, 216. Thus, defense counsel's testimony lends no support to Appellant's assertion

of counsel ineffectiveness for failing to investigate a diminished capacity defense.

Finally, Appellant attempts to rely on the testimony of two psychiatrists, Dr. Fox and Dr. Blumberg, who were retained by PCRA counsel to evaluate Appellant. Dr. Fox, who evaluated Appellant in 2000 and 2007, respectively five and twelve years after the murders, opined that, at the time of the murders, Appellant was unable to formulate a specific intent to kill due to a combination of his post-traumatic stress disorder and his substance abuse. N.T. PCRA Hearing, 6/9/08, at 112–14. Dr. Blumberg, who evaluated Appellant in 2006, eleven years after the murders, did not testify specifically as to Appellant's ability to formulate intent. Dr. Blumberg set forth the abusive circumstances of Appellant's childhood, and opined that, at the time of Ms. Gunnet's murder, Appellant was suffering from three psychiatric conditions, to wit, post-traumatic stress disorder, chronic/severe; personality disorder not otherwise specified with dependent schizotypal borderline and anti-social features; and polysubstance abuse, including marijuana, LSD, cocaine, and methamphetamine. *Id.*, 9/17/07, at 315–16. However, Dr. Blumberg did **not** opine that, at the time of Ms. Gunnet's murder or any other time, Appellant was unable to formulate the specific intent to kill or was overwhelmed to the point of losing his faculties and sensibilities. In fact, on cross-examination, Dr. Blumberg testified as follows:

> I'm not specifically correlating [Appellant's] significant impairment and judgment, impulse, control, mood and affect necessarily to the three other killings [i.e., of Ms. Ohlinger, Ms. Gunnet, and Ms. Amstutz]. I don't know what the impact—you know, what impact that might or might not have had.

*Id.* at 462.

With regard to Appellant's mental state at the time of the murders, Dr. Blumberg opined only as follows: "... in my opinion, the combination of [Appellant's mental] disorders represents an extreme mental or emotional disturbance that was present at the time [of Ms. Gunnet's murder]." *Id.* at

440. An "extreme mental or emotional disturbance" does not in any factual or legal sense equate to an inability to formulate intent, and thus cannot support the advancement of a diminished capacity defense.

· After thorough review of all the evidence proffered by Appellant to support his claim that counsel was ineffective for failing to investigate and develop a defense of diminished capacity, we conclude that the PCRA court did not abuse its discretion in declining to grant relief on this claim. The **only** evidence cited by Appellant that actually supports the viability of a defense grounded in diminished capacity due to mental defect is one excerpt of the testimony of Dr. Fox, a psychiatrist who evaluated Appellant years after the murders. *See* text, *supra.* The testimony of Dr. Blumberg lends no support to such a defense, nor does the testimony of any other witness relied upon by Appellant, as we have explained. Furthermore, Appellant fails to recognize or contemplate that the evidence presented at trial strongly indicates that, at the time of Ms. Gunnet's murder, Appellant was able to formulate the intent to evade the authorities, who he knew were seeking him in connection with a prior homicide; to steal a car from Ms. Gunnet and drive to a remote area with her as a passenger; to take Ms. Gunnet's cash, as well as her credit cards and rings, which he attempted to sell; to drive away rapidly in her vehicle after firing three shots; and, within hours after the murder, to seek out and find an acquaintance for assistance with his wounds. Finally, Appellant has never admitted that he killed Ms. Gunnet, not at trial, where he attempted to shift blame for the murder onto Ms. Noland, nor in this collateral appeal, where he continues to attempt to implicate Ms. Noland. All of this evidence of Appellant's directed, intentional, goal-oriented activity at or near the time of the murder argues strongly against his current assertion that diminished capacity would have been a viable guilt-phase defense had counsel only done further investigation.

Thus, after thorough review of the entire record, we conclude that Appellant's claim of counsel ineffectiveness for failing to investigate or develop a defense of diminished capac-

ity due to voluntary intoxication or mental defect has no arguable merit. Accordingly, Appellant is entitled to no relief on his fourth issue.

### Issue 5: Guilt–Phase Jury Instructions[23]

Appellant asserts that the trial court erred with respect to its guilt-phase jury instructions in the following two ways: (a) by informing the jury of the maximum possible sentences for first-, second-, and third-degree murder; and (b) by failing to instruct the jury that evidence of prior bad acts can be used only for a limited purpose. Appellant's Brief at 34–37. The PCRA court denied relief, concluding these claims of trial court error had been waived or previously litigated.[24] PCRA Court Opinion at 5–6 (citing 42 Pa.C.S. §§ 9544(b) and 9543(a)(3)). We address each sub-issue in turn.

With regard to sub-issue (a), the alleged trial court error has been waived pursuant to subsection 9544(b), because Appellant did not raise a timely objection. However, waiver does not totally resolve this sub-issue because Appellant also asserts that counsel was ineffective for not objecting to the jury instruction and for not raising the matter on direct appeal. Appellant's Brief at 34–37. In raising this ineffectiveness claim, Appellant has not fully appreciated the consequences of his self-representation during the guilt phase of his

---

**23.** Appellant also asserts prosecutorial misconduct in Issue 5. *See* Appellant's Brief at 1 (Statement of Questions Presented). However, Appellant presents no argument for, and indeed does not even mention, prosecutorial misconduct in the Argument section of Issue 5. *See* Appellant's Brief at 34–37. All of Appellant's claims of prosecutorial misconduct are addressed in Issue 6. *See* text, *infra*.

**24.** The PCRA court did not explain its holding, nor individually mention or discuss, the two distinct sub-issues in Issue 5.

Appellant notes that sub-issue (a), *i.e.*, the instruction as to possible sentences for murder, was raised in his Amended Petition, claim VIII. *See* Appellant's Brief at 34 n. 12. However, he does not point out where the second sub-issue was raised, and it is not clear from our review of the voluminous record that this sub-issue was in fact raised before the PCRA court. *See* Pa.R.A.P. 2117(c) and 2119(e) (requiring a specific reference to the places in the record where a matter appears in order to show that it was properly raised below and hence is preserved for appeal). As we discuss in the text, *infra*, sub-issue (b) was litigated on direct appeal and thus is not cognizable under the PCRA.

trial. As this Court has held on several occasions, when an appellant knowingly, voluntarily, and intelligently has chosen to exercise his right to self-representation, he cannot obtain relief by raising his own ineffectiveness or that of standby counsel. *Spotz VI,* 18 A.3d at 270; *Commonwealth v. Fletcher,* 604 Pa. 493, 986 A.2d 759, 774, 778 (2009) (*"Fletcher III "*); *Commonwealth v. Fletcher,* 586 Pa. 527, 896 A.2d 508, 522 n. 13 (2006) (*"Fletcher II "*); *Commonwealth v. Bryant,* 579 Pa. 119, 855 A.2d 726, 736–38 (2004). Here, Appellant chose to represent himself during the guilt phase of trial; accordingly, pursuant to our established precedent, we will not entertain his claim of ineffectiveness of standby counsel for failure to object to the guilt-phase jury instructions.[25]

**25.** In an attempt to avoid waiver of this sub-issue, Appellant makes the bald assertion that direct appeal counsel could have raised it under the relaxed waiver rule. Appellant's Brief at 35. Under relaxed waiver, this Court retained the discretion to review unpreserved issues in capital appeals. *See, e.g., Fletcher III,* 986 A.2d at 775 n. 18. Although the relaxed waiver doctrine was abrogated with respect to PCRA appeals and direct appeals in, respectively, *Commonwealth v. Albrecht,* 554 Pa. 31, 720 A.2d 693 (1998), and *Commonwealth v. Freeman,* 573 Pa. 532, 827 A.2d 385, 403 (2003), at the time of Appellant's trial, the doctrine was in effect.

Appellant fails to develop an argument to support his assertion that this Court would have reviewed, under relaxed waiver, the claim he raises here. Furthermore, Appellant fails to consider this Court's holding in *Fletcher III,* where a PCRA appellant sought review of claims of ineffectiveness for failing to raise on direct appeal several unpreserved claims of trial court error that had arisen during a period of the appellant's self-representation. *Id.* at 774–79. The *Fletcher III* appellant argued that his claims were reviewable under the relaxed waiver doctrine that was in effect at the time he waived his right to counsel. We disagreed and declined to review his unpreserved claims under the relaxed waiver doctrine. *Id.* at 779. With this holding, we reiterated our concern that, were we to permit a *pro se* defendant to raise his own ineffectiveness, he could guarantee himself a new trial by intentionally being ineffective, thereby making a mockery of the judicial system. *Id.* (citing *Bryant,* 855 A.2d at 736–37). We also recognized that allowing the *Fletcher III* appellant to invoke the relaxed waiver doctrine and thus obtain review of his claim of appellate counsel ineffectiveness would completely undermine our holdings in *Bryant, supra,* and *Fletcher II, supra. See Spotz VI,* 18 A.3d at 278 (discussing *Fletcher III* in the context of a claim raised by Appellant in his collateral appeal from his Cumberland County murder conviction).

In relying on *Fletcher III* to reject Appellant's invocation of relaxed waiver, we do not ignore our holding in *Commonwealth v. Williams,* 594 Pa. 366, 936 A.2d 12, 24, 26 (2007), where we concluded that

With regard to sub-issue (b), the alleged trial court error was raised on direct appeal, at which time this Court concluded as follows:

> [T]he trial court properly instructed the jury that it could only consider the other crimes evidence for its relevant limited purposes and not merely as evidence of [A]ppellant's propensity to commit crimes. For this additional reason, no relief is due.

*Spotz II*, 756 A.2d at 1153. Thus, the trial court error alleged in sub-issue (b) has been previously litigated and, as such, is not cognizable under the PCRA, pursuant to subsection 9543(a)(3). Because we have previously concluded that Appellant's claim of trial court error in sub-issue (b) is meritless, his derivative claim of counsel ineffectiveness is also meritless.

In sum, Appellant is entitled to no relief on either of his sub-issues in Issue 5.

## Issue 6: Prosecutorial Misconduct[26]

In Issue 6, Appellant raises the following eight allegations of prosecutorial misconduct: (a) the prosecutor physically touched and verbally harassed Appellant during the trial; (b) the prosecutor used biblical references to support the death

direct appeal counsel *was* ineffective for failing to invoke relaxed waiver to secure review of a claim that implicated the appellant's actual innocence of a racketeering charge. Here, however, Appellant's claim does not implicate actual innocence, and we have no difficulty concluding that we would not have accepted it for review under the relaxed waiver doctrine.

26. Appellant has failed to comply with Pa.R.A.P. 2119(a): "The argument shall be divided into as many parts as there are questions to be argued...." Appellant raises eleven questions in his Statement of Questions Presented. *See* Appellant's Brief at 1–2; *see also* footnote 4, *supra* (reproducing verbatim Appellant's eleven issues). However, the argument section of Appellant's brief has twelve parts. Appellant raises allegations of prosecutorial misconduct in part six as well as part seven of his argument section. The misconduct alleged in part six of Appellant's argument section took place during the guilt phase of trial, and thus is not even encompassed within the statement of Issue 6, where Appellant claims prosecutorial misconduct in the penalty phase. *See* Appellant's Brief at 1, Issue 6. We address all of Appellant's claims of prosecutorial misconduct, whether in the guilt or penalty phase, under Issue 6.

penalty and minimize mitigation factors; (c) the prosecutor improperly argued that the jury had a duty to return a death sentence; (d) the prosecutor injected emotion, passion, and prejudice into the jury's sentencing determination by referring to the family of the victim; (e) the prosecutor misrepresented facts of Appellant's prior burglary convictions and elicited testimony concerning other burglaries for which Appellant had been investigated but not arrested; (f) the prosecutor improperly stated that the jury's guilt-phase verdict had proven the 42 Pa.C.S. § 9711(d)(6) aggravating factor (killing committed during the perpetration of a felony); (g) the prosecutor injected his personal opinion as to the severity of abuse and dysfunction in Appellant's childhood home; and (h) the prosecutor improperly argued that a death sentence was appropriate as retaliation for women in general, as well as for the victim. In addition, Appellant asserts a generalized claim of ineffective assistance of counsel for failing to object to the prosecutor's alleged misconduct and/or to raise it on direct appeal. Appellant's Brief at 37–45.

The PCRA court did not specifically address most of Appellant's claims of prosecutorial misconduct, apparently finding them waived or previously litigated. *See* PCRA Court Opinion at 5–6. One exception is Appellant's claim of verbal and physical intimidation by the prosecutor, which the PCRA court expressly found meritless, although with little explanation other than the determination that Appellant had received a fair trial. The PCRA court also summarily rejected Appellant's claim as to burglary convictions as an aggravating factor, citing the decision from this Court denying Appellant's Schuylkill County collateral appeal. *Id.* at 20 (citing *Spotz V*, 896 A.2d at 1240–42).

Before addressing each of Appellant's specific claims of prosecutorial misconduct and his derivative claims of ineffective assistance, we set forth the legal principles relevant to our review:

[A] claim of ineffective assistance grounded in counsel's failure to object to a prosecutor's comments may succeed when the petitioner demonstrates that the prosecutor's com-

ments violated a constitutionally or statutorily protected right, such as the Fifth Amendment privilege against compulsory self-incrimination or the Sixth Amendment right to a fair trial, or a constitutional interest such as due process. *Commonwealth v. Cox*, 603 Pa. 223, 983 A.2d 666, 685 (2009) (quoting *Commonwealth v. Tedford*, 598 Pa. 639, 960 A.2d 1, 29 (2008)). To constitute a due process violation, the prosecutorial misconduct must be of sufficient significance to result in the denial of the defendant's right to a fair trial. *Cox, supra* at 685 (quoting *Greer v. Miller*, 483 U.S. 756, 765, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987)). The touchstone is the fairness of the trial, not the culpability of the prosecutor. *Id.*

A prosecutor may make fair comment on the admitted evidence and may provide fair rebuttal to defense arguments. *Id.* at 687. Even an otherwise improper comment may be appropriate if it is in fair response to defense counsel's remarks. *Id.* Any challenge to a prosecutor's comment must be evaluated in the context in which the comment was made. *Id.* During closing argument in the penalty phase, a prosecutor must be afforded reasonable latitude, and permitted to employ oratorical flair when arguing in favor of the death penalty. *Commonwealth v. Stokes*, 576 Pa. 299, 839 A.2d 226, 231–32 (2003). It is not improper for the prosecutor to urge the jury to view the defense's mitigation evidence with disfavor and thus to impose the death penalty. *Id.* at 233.

Not every unwise, intemperate, or improper remark made by a prosecutor mandates the grant of a new trial[.] Reversible error occurs only when the unavoidable effect of the challenged comments would prejudice the jurors and form in their minds a fixed bias and hostility toward the defendant such that the jurors could not weigh the evidence and render a true verdict. *Cox, supra* at 687 (citation omitted); *see also Commonwealth v. Carson*, 590 Pa. 501, 913 A.2d 220, 242 (2006).

*Spotz VI*, 18 A.3d at 288 (internal quotation marks omitted).

■ In sub-issue 6(a), Appellant asserts that H. Stanley Rebert, who was the York County District Attorney and

primary prosecutor at Appellant's trial, intimidated him verbally and physically, allegedly denying Appellant his rights to a fair trial and to self-representation. Appellant cites the following three incidents in support of this claim, all of which took place during the guilt phase of trial when Appellant was acting *pro se*. First, during a discussion of trial exhibits, conducted outside the presence of the jury near the beginning of the trial, Mr. Rebert apparently touched Appellant.[27] Second, six days later, immediately after the court, on its own initiative, conferred with a juror as to her ability to continue to pay attention to the testimony, Appellant complained to the court about the prosecutor's aggressive behavior as follows:

*Appellant:* I'd like to state Mr. Rebert has been aggressive to me. All these security measures are because of my aggressiveness to him. He put his hand on me, tried to push me. He's putting his hands in my face and hollering at me.

*Court:* Let the record show they are not in the presence of the jury. So what the two of you want to do is up to you.

\* \* \*

*Mr. Rebert:* Your Honor, the reason that I have reacted in the manner that I did was because [Appellant] made a comment to me asking me if I was the one that asked [the questioned juror] in for this conference. My reaction to that was, he was simply trying to put out to the jury that was the case and in some way affect the juror. That was the reason for my reaction. I suspect he will not deny he

---

**27.** As revealed by the transcript, the incident was as follows:

*Appellant:* ... I request[e]d to use [a photograph of Christina Noland] as an exhibit and I asked to see it. And I would like to see it now to know if I want to use it.

*Mr. Rebert:* That's the photograph in the envelope, Your Honor.

*Court:* In the envelope? Where is the envelope? Show it to him.

*Mr. Rebert:* Stay right here, Jack.

*Appellant:* Don't put your hands on me, Jack. Don't touch me, Mr. Rebert. Hands off. Your Honor, I have attempted to do my best to go through this and be ready for cross-examination. Given the amount of stuff that I have, the best thing I can do would be to go through each—this is one preliminary hearing transcript. There's a few more. There's other trial testimony, statements.....

N.T. Trial, 4/13/96, at 263–64.

said that as the juror was walking by. I want the record to reflect that.

*Appellant:* Let the record reflect the woman was sitting in the seat beside Mr. Rebert. I simply asked, did you call her in? It's bizarre to even suggest that I did it to prejudice the jury against the Commonwealth.

*Court:* The answer to the question, Mr. Rebert, would have been [ ] no, [the court] did. And I would have been happy to tell the juror that, so we don't run into any problems with regard to that.

N.T. Trial, 4/18/96, at 1335–36.

Third, on the same day, just after one of the defense witnesses invoked her Fifth Amendment right not to testify, Appellant stated the following:

*Appellant:* You got one more chance to do some stupid shit to me, Mr. Rebert. Just so you know, I'm not going to keep going with all the bullshit. I've been doing something—I'm going to keep trying to be cool. I'm not going for no more of this throwing things at me, pushing me, screaming in my face one more time. I'm not going for it one more time, one more time.

*Court:* Just so the record will reflect, the jury is not present to hear the statement of [Appellant].

*Id.* at 1449–50. There is no indication from the record as to what specific action by Mr. Rebert prompted Appellant's above-quoted statement.

Appellant relies on the PCRA testimony of his trial counsel, Ms. Smith, who testified that she heard Mr. Rebert and Appellant arguing in the courtroom and that Mr. Rebert touched or pushed Appellant, in violation of the rules set forth by the sheriff who was responsible for security. N.T. PCRA, 6/9/08, at 203–05. Appellant then simply asserts, without argument or any development, that "[t]he prosecutor's misconduct was clearly designed to deny Appellant [ ] his right to a fair trial and his right to self-representation and violated Appellant's Sixth, Eighth and Fourteenth Amendment rights." Appellant's Brief at 38. Appellant has failed to set forth any

evidence that his right to a fair trial, his right to self-representation, or any other Sixth or Eighth Amendment right was compromised by the prosecutor's conduct. Our focus is on the fairness of Appellant's trial, not on the culpability of the prosecutor. *See, e.g., Spotz VI, supra* at 288 (citing *Commonwealth v. Cox,* 603 Pa. 223, 983 A.2d 666, 685 (2009)). The incidents that Appellant cites, all of which we have set forth verbatim from the record, *see supra,* were brief and out of the presence of the jury. We fail to see how they might have affected Appellant's right to a fair trial or his right to self-representation. There is no merit to Appellant's first claim of prosecutorial misconduct, and thus appellate counsel was not ineffective for failing to raise this claim on direct appeal.[28]

In sub-issue 6(b), Appellant claims that the prosecutor improperly used two biblical references to argue during the penalty phase for a sentence of death and to minimize mitigation factors. First, Appellant cites the following excerpt of his mother's cross-examination by the prosecutor, which took place shortly after she had testified on direct examination that Appellant "always believed in God [and] has always had great respect for Christianity." N.T. Penalty Phase, 4/23/96, at 138.

*Mr. Rebert:* You indicated that ... one of your son Mark's characteristics was great respect for Christianity?

*Mother:* Yes.

*Mr. Rebert:* Are you at all familiar with the Ten Commandments?

*Mother:* Yes.

*Defense Counsel:* Your Honor, I'm going to object.

*Court:* Sustained.

---

**28.** We reiterate that the prosecutorial misconduct alleged in this first sub-issue occurred during the guilt phase of trial, when Appellant was acting *pro se.* Although Appellant did not make a formal motion concerning the prosecutor's alleged physical and verbal harassment, Appellant did bring the matter to the trial court's attention. *See* text, *supra* (quoting from N.T. Trial, 4/18/96, at 1335). Thus, Appellant arguably preserved the matter for review, and we have therefore addressed Appellant's allegations on the merits. The prosecutorial misconduct alleged in the remaining sub-issues of Issue 6 occurred during the penalty phase, when Appellant was represented by counsel.

*Mr. Rebert:* Your Honor, cross examination. She talks about Christianity. There are certain things you're supposed to do and not supposed to do. If he's so familiar—

*Court:* The objection is sustained, Mr. Rebert. Continue.

*Id.* at 146.

Based on this exchange, Appellant asserts that his Sixth, Eighth, and Fourteenth Amendment rights were violated, relying on this Court's decision in *Commonwealth v. Chambers*, 528 Pa. 558, 599 A.2d 630, 643–44 (1991), which, as we discuss immediately below, was decided based on state law. In *Chambers, supra* at 643, the prosecutor included the following statement in his closing argument: "Karl Chambers has taken a life. As the Bible says, 'and the murderer shall be put to death.'" We concluded that the prosecutor had interjected religious law .as an additional, improper factor for the jury's consideration, leading to the possibility that the death sentence imposed was the product of passion, prejudice, or other arbitrary factor. Therefore, based on this Commonwealth's capital sentencing statute, which carefully and specifically delineates all the factors that a jury must consider when determining whether the death penalty is appropriate, we vacated the appellant's sentence of death and remanded for a new sentencing hearing. *Id.* at 644. *Chambers* also included a strong admonition that "reliance in any manner upon the Bible or any other religious writing in support of the imposition of a penalty of death is reversible error *per se.*" *Id.*

■ However, our holding in *Chambers* does not preclude a prosecutor from making fair response when the defense raises arguments of a religious nature. For example, in *Commonwealth v. Brown*, 551 Pa. 465, 711 A.2d 444, 457–58 (1998), wherein we discussed and applied the holding in *Chambers*, we explicitly considered whether the fair response doctrine was applicable. Although we concluded that the prosecutor's unmistakable reference to specific biblical passages necessitated a new sentencing hearing, we also noted that our review of the entire record led us to conclude that the biblical reference at issue in *Brown* could not be considered a fair response to a defense argument. *Brown, supra* at 458 n. 11.

We contrasted *Brown's* circumstances with those in *Commonwealth v. Whitney*, 511 Pa. 232, 512 A.2d 1152, 1159–60 (1986), wherein we held that a prosecutor's biblical invocation of the "Prince of Darkness" was permissible because it was responsive to the arguments of defense counsel. *Brown, supra* at 456 (discussing *Whitney, supra*). Thus, we do not interpret *Chambers* or *Brown* to bar a prosecutor from making fair response to the defense's religious arguments.

Here, the defense opened the matter of Appellant's religious philosophy by eliciting testimony that Appellant had "great respect for Christianity." N.T. Penalty Phase, 4/23/96, at 138. Pursuant to the fair response doctrine, the prosecutor could properly probe the depths of Appellant's respect for and understanding of that religious tradition. However, the defense objected to the line of questioning, and the trial court granted the objection. The prosecutor did not commit any misconduct, and Appellant's undeveloped derivative claim that counsel was somehow ineffective in raising this matter is likewise meritless.

The second biblical reference cited by Appellant was made by the prosecutor in his closing argument. Specifically, after acknowledging that Appellant had a troubled childhood, the prosecutor then commented that Appellant "became a man and put away childish things" long before the murders. N.T. Penalty Phase, 4/24/96, at 371. Appellant challenged this same statement on direct appeal, and argued there, as he does here, that the prosecutor was invoking a specific biblical passage, to wit, I Corinthians 13:11, to argue against Appellant's proffered mitigating factor of a troubled childhood. *Spotz II*, 756 A.2d at 1164–65. We rejected Appellant's challenge on direct appeal, distinguishing it from *Chambers* and *Brown*. Here, Appellant merely re-raises the same claim, which is not cognizable under the PCRA because it has been previously litigated.[29] Thus, Appellant is entitled to no relief.

In sub-issues 6(c) and (d), Appellant challenges portions of the prosecutor's penalty-phase closing argument in which he

---

29. Appellant tries to escape the statutory bar to re-review of this claim by invoking the PCRA testimony of Mr. Rebert, wherein he acknowl-

argued in favor of sentencing Appellant to death. The relevant excerpt, with the challenged portions emphasized, is as follows.

We spent a lot of time on this case.... I'd like to think that you've seen the best York County has to offer. I'd like to thank Mrs. Fawcett [the other prosecutor]. *I'd like to thank the police officers. I'd like to thank this entire county for their help in prosecuting [Appellant].*

It's been difficult for us and difficult for [Appellant]. It's been difficult for you, but the most difficult task is yet to be accomplished and that is for you to sit in judgment on the fate of [Appellant]. His life is quite literally in your hands. The Commonwealth submits that [Appellant] deserves to die. *The law permits it, the Commonwealth seeks it, Penny Gunnet's family demands it.*

The [c]ourt will instruct you as to what standards are to be used in this determination. *You are sworn as jurors and you took an oath[;] and when you were asked questions during the voir dire process[,] you indicated that you could impose the death penalty[,] and you would impose the death penalty if the circumstances warranted and the Commonwealth met its burden of proof. The Commonwealth will be holding you to that oath, ladies and gentlemen.* The task before you, as I also said when we talked earlier, is awesome indeed and one that will not likely be shared by any of us and very few other people.

[Here follows brief general remarks about aggravating and mitigating circumstances]

The Commonwealth will be presenting a number of aggravating circumstances.

A life for a life is not the law in Pennsylvania. It is only when the Commonwealth can establish certain aggravating

edged that the comment regarding "childish things" was a reference to a verse in the Bible, and was a part of his argument urging the jury to reject the mitigating circumstances proffered by Appellant. N.T. PCRA, 9/18/07, at 535. Mr. Rebert's PCRA testimony has no effect on our analysis or our decision as set forth on direct appeal with regard to this matter, *see Spotz II*, 756 A.2d at 1164–65, nor does his testimony alter the characterization of this matter as previously litigated.

circumstances that we can even request that the death penalty be imposed.

N.T. Penalty Phase, 4/24/96, at 363–65 (emphasis added to the challenged portions, as cited in Appellant's Brief at 40–41).

In sub-issue 6(c), Appellant asserts that the prosecutor violated the Sixth, Eighth, and Fourteenth Amendments by arguing that the community supported the imposition of a death sentence and that it was the jury's duty to impose such a sentence. Appellant's Brief at 40. Taking the prosecutor's comments here as a whole and in context, as we must, it is clear that Appellant's assertions of misconduct are meritless. The prosecutor's comments emphasize that the jury—and the jury alone—must decide whether Appellant should be sentenced to death. Thanking those who aided Appellant's prosecution does not in any way imply a diminution of the jury's responsibility in this regard. Nor is the prosecutor's clear statement of the jury's responsibility diminished or qualified by the unremarkable and obvious oratorical assertion that the Commonwealth seeks the death penalty. (Appellant's claims as to the prosecutor's statement that the victim's family demands death are addressed in the next sub-issue.) The prosecutor's harkening back to *voir dire* merely recalls for the jurors their oath to apply the law of this Commonwealth. Appellant's assertions of misconduct are grounded in a reading of the above-reproduced excerpt that is unreasonable based on the plain text of the argument. No relief is due.[30]

In sub-issue (d), Appellant asserts that the prosecutor injected emotion, passion, and prejudice into the jury's sentenc-

30. Appellant also alleges in this sub-issue that, during *voir dire*, the prosecutor "repeatedly resorted to fear-mongering, inferring that the increasing crime rate was a permissible basis to find death." Appellant's Brief at 40. As an example of this alleged "fear-mongering," Appellant cites the following question asked of a potential juror by the prosecutor:

[I]t's one thing to be in favor of [the death] penalty. It might be even popular [in] these days of increased crime rates and so forth. It's yet another thing to stand in a jury box, face the [Appellant], especially when he is representing himself, face the [Appellant] and tell him, I impose the death penalty. Would you be able to do that, sir, if the circumstances were proven to your satisfaction?

ing determination by stating that "[the victim's] family demands [a death sentence]." N.T. Penalty Phase, 4/24/96, at 363 (quoted in context in the text immediately above).

As this Court has often stated, "[c]omments by a prosecutor do not constitute reversible error unless their unavoidable effect was to prejudice the jury, forming in [the jurors'] minds a fixed bias and hostility toward the defendant such that they could not weigh the evidence objectively and render a true penalty determination." *Commonwealth v. Paddy*, 609 Pa. 272, 15 A.3d 431, 458 (2011) (citation omitted); *see also Spotz VI*, 18 A.3d at 288 (expressing same principle). During closing argument of a capital sentencing hearing, the prosecutor is permitted by statute to present argument in favor of the sentence of death. *Paddy, supra* at 459; *Commonwealth v. Tedford*, 598 Pa. 639, 960 A.2d 1, 49 (2008) (citing 42 Pa.C.S. § 9711(a)(3)). This Court has recognized that some part of the rationale for a death sentence involves retribution, and we have declined to hold that a prosecutor's comments were improper merely because he suggested in an exercise of rhetorical flair the appropriateness of this rationale. *Commonwealth v. Whitney*, 511 Pa. 232, 512 A.2d 1152, 1157–59 (1986).

Here, Appellant challenges one sentence in a string of three short sentences obviously put together for

N.T. *Voir Dire*, 4/8/96, at 213–14.

It is abundantly clear that the prosecutor was asking potential jurors to consider not simply their theoretical views on the death penalty, which may have been influenced by any number of societal factors, but, more importantly, their actual ability to impose a sentence of death on a flesh-and-blood human being standing in front of them. There is nothing improper about such a question. Appellant blatantly misconstrues the prosecutor's words. In addition, we note that both sides accepted into the jury the prospective juror to whom the above question was addressed. *Id.* at 214.

Furthermore, Appellant again ignores the fact that he proceeded *pro se* during *voir dire,* and he has failed to point out a single instance in which he made a timely objection to this line of questioning by the prosecutor. Thus, the claim is waived, and no derivative claim of ineffectiveness is possible because Appellant proceeded *pro se. See* text, *supra,* discussion of Issue 5(a).

rhetorical flair: "The law permits it [sentencing Appellant to death]; the Commonwealth seeks it; *Penny Gunnet's family demands it.*" N.T. Penalty Phase, 4/24/96, at 363 (emphasis added to portion cited by Appellant in his Brief at 40). While it is obvious that the "demands" of a victim's family would be an improper sentencing consideration, it cannot be considered surprising—to the court or to the jury—that a murder victim's family might want to see their loved one's killer suffer the ultimate punishment. The jury here was told repeatedly and graphically that it and it alone bore the responsibility to determine Appellant's sentence. *See, e.g.*, N.T. Penalty Phase, 4/24/96, at 363 (where the prosecutor told the jury that "[Appellant's] life is quite literally in your hands"); *id.* at 397 (where the court instructed the jury that "[y]ou are the ones who decide the sentence of either death or life imprisonment"). We cannot conclude that the four-word sentence challenged by Appellant, which was added for rhetorical flair, so prejudiced the jurors that they formed in their minds a fixed bias and hostility toward the defendant and were unable to weigh the evidence and render a fair verdict. *See Spotz VI, supra* at 288, and citations therein. Hence, Appellant's claim of prosecutorial misconduct and his derivative claim of counsel ineffectiveness for failing to object to this statement fail.[31]

In sub-issue 6(e), Appellant claims that the prosecutor misrepresented facts of Appellant's prior burglary convictions

---

31. Appellant also contends in sub-issue (d) that the prosecution elicited inadmissible victim impact evidence, which "repeatedly reminded [the jury] of the [Gunnet] family's pain." Appellant's Brief at 40. In support of this contention, Appellant cites only two excerpts of the notes of testimony, both from the testimony of Jeffrey Gunnet, the victim's husband. *Id.* (citing N.T. Trial, 4/12/96, at 123, 125–26). Appellant's assertions are entirely meritless for a number of reasons.

Appellant ignores the fact that Mr. Gunnet's testimony was presented during the guilt phase of trial, when Appellant was proceeding *pro se.* Appellant did not object to the testimony, and thus he did not preserve his challenge for review. Furthermore, because he was proceeding *pro se*, no derivative ineffectiveness claim is available to him. *See* text, *supra*, discussion of Issue 5(a).

In addition, we feel compelled to point out that Appellant has incorrectly characterized Mr. Gunnet's testimony as victim impact evidence. As this Court has made clear, victim impact testimony is testimony as to the impact of the victim's death on the victim's family. *Commonwealth*

during closing argument in support of the aggravating circumstance of significant history of violent felony convictions. 42 Pa.C.S. § 9711(d)(9). Appellant asserts, without benefit of argument, that the prosecutor's comments violated Appellant's Sixth, Eighth, and Fourteenth Amendment rights.

We first note the following relevant legal principles. Burglary is a crime of violence as a matter of law, and a defendant's prior burglary convictions are properly admitted as evidence of a significant history of violent felony convictions pursuant to subsection 9711(d)(9). *Spotz VI*, 18 A.3d at 284–85 (citing *Commonwealth v. Small*, 602 Pa. 425, 980 A.2d 549, 576–77 (2009); *Commonwealth v. Bracey*, 541 Pa. 322, 662 A.2d 1062, 1075 n. 15 (1995); *Commonwealth v. Rolan*, 520 Pa. 1, 549 A.2d 553, 559 (1988)); *Spotz V*, 896 A.2d at 1241. The fact that a defendant's specific burglaries did not involve violence does not preclude their use to satisfy aggravating circumstance 9711(d)(9). *Spotz VI, supra* at 284–85; *Spotz V, supra* at 1241.[32]

*v. Means*, 565 Pa. 309, 773 A.2d 143, 158 (2001) (Opinion Announcing the Judgment of the Court); *see* 42 Pa.C.S. § 9711(a)(2) ("In the sentencing hearing [after a first-degree murder conviction], evidence concerning the victim and the impact that the death of the victim has had on the family of the victim is admissible."). Mr. Gunnet did *not* testify as to the impact of his wife's death on him or on their family. Mr. Gunnet testified about his wife's morning routine, which she followed on the morning of her murder, the last time he saw her alive. N.T. Trial, 4/12/96, at 123–25. Mr. Gunnet explained that she always left their house in the early morning hours during tax season to get to her job at an accounting firm; described the route that his wife always drove from home to her workplace; and identified her car in a Commonwealth photo exhibit, as well as some of her other belongings. Mr. Gunnet testified that when he made his daily routine call to his wife's office at approximately 7:15 on the morning of her murder, he was unable to reach her and became concerned. *Id.* at 125–30. Mr. Gunnet then described the circumstances under which he learned that his wife was dead. *Id.* at 131. All of this was factual evidence concerning the victim's activities in the hours before her murder and the identification of her relevant belongings. Appellant's assertion that Mr. Gunnet's testimony constitutes victim impact evidence is simply wrong.

32. In his collateral appeals of his Cumberland County and Schuylkill County first-murder convictions, Appellant raised similar challenges to

Here, at the beginning of the penalty phase of Appellant's trial, the Commonwealth introduced Appellant's three 1990 Cumberland County burglary convictions to support the subsection 9711(d)(9) aggravating factor. N.T. Penalty Phase, 4/23/96, at 16–17. Then, during closing argument, while discussing this aggravating factor, the following exchange took place:

*Prosecutor:* The second aggravating circumstance, ladies and gentlemen, is that [Appellant] has a significant history of felony convictions involving violence or the threat of violence to the person.... The record reflected during the course of the testimony that [Appellant] was convicted of robbery in Cumberland County, conspiracy to commit robbery in Cumberland County, robbery in Cumberland County, three counts of burglary in Cumberland County.

\* \* \*

Burglary.... Burglary is a crime of violence. Perhaps the most frightening thing that can happen ... one of the most frightening things that can happen is a man intruding or a woman intruding into your house.

*Defense Counsel:* Your Honor, I'm going to object at this point. There was no testimony about the nature of the burglaries at all.

*Prosecutor:* Burglary is a burglary.

*Defense Counsel:* Was it a home? Was it a building?

*Prosecutor:* It was a home. It was a building.

*Defense Counsel:* It was never testified there was anyone's home [sic]—

*Court:* That's true. Burglary is, as you know, under the law[,] entering a building without lawful right or being invited to commit a crime in the building, but no one needs to be there for burglary. Just so the jury understands that. As far as commenting as to the evidence or the factual

the Commonwealth's introduction of his prior burglary convictions as evidence in support of aggravating factor 9711(d)(6). *See Spotz VI*, 18 A.3d at 284–85; *Spotz V*, 896 A.2d at 1240–41 & n. 41, 42. The respective PCRA courts determined, and we affirmed, that there was no merit to Appellant's claims.

234

circumstances surrounding the offenses, I would suggest counsel not refer to those since that wasn't given to the jury nor will it be given.

*Prosecutor:* Your Honor, may I say that the burglary is considered a crime of violence as it's defined by the law?

*Court:* Yes, you can. That is the law.

N.T. Penalty Phase, 4/24/96, at 365–68.

The trial court correctly determined that burglary is a crime of violence as a matter of law, and that a defendant's prior burglary convictions are properly admitted as evidence of a significant history of violent felony convictions pursuant to subsection 9711(d)(9). In addition, following defense counsel's objection, the trial court properly cautioned the prosecutor not to argue factual details of Appellant's burglary convictions that had not been presented to the jury. From our review of the notes of testimony, we conclude that there was nothing in the prosecutor's brief and general comments about the crime of burglary that could have so prejudiced the jury against Appellant that it was unable to weigh the evidence and reach a fair verdict. *See Spotz VI, supra* at 288, and citations therein. Accordingly, we conclude that there was no prosecutorial misconduct.

In the second part of this sub-issue, Appellant alleges that the prosecutor "elicited testimony that Appellant had been investigated—but not arrested or convicted—for 53 additional burglaries." Appellant's Brief at 42. Appellant refers specifically to the following portion of the penalty-phase examination of Commonwealth witness Gerald Henneman, a retired state trooper who had investigated the burglaries that led to Appellant's 1990 convictions. The Commonwealth called Mr. Henneman to identify Appellant as the individual who had been convicted of those burglaries, and started its examination of Mr. Henneman as follows.

*Prosecutor:* In 1989, did you conduct an investigation that resulted in three charges of burglary being filed against [Appellant] ... ?

*Witness:* Yes, Ma'am. I conducted 53 investigations.

*Defense Counsel:* Your Honor, I'm going to object to that.
*Court:* Just stick to the responses to the questions, Officer.
*Witness:* Yes, sir.

N.T. Penalty Phase, 4/23/96, at 21–22.

The record, including the above excerpts from the notes of testimony, lends no support to Appellant's assertion that the prosecutor "elicited" testimony that Appellant had been investigated in 53 additional burglaries. When asked if he had conducted the investigation that led to three burglary charges being filed against Appellant, the witness volunteered that he had conducted 53 investigations, although it remained unclear whether all these investigations were related or involved Appellant. We conclude that nothing about this brief and vague exchange could have so prejudiced the jury that it was unable to weigh the evidence and reach a fair verdict. Thus, there was no prosecutorial misconduct.

 While Appellant recognizes that trial counsel objected to both of the prosecutor's statements challenged in this subissue, Appellant contends that trial counsel was ineffective for not seeking a curative instruction in each case. We cannot conclude that Appellant was prejudiced by counsel's failure to request curative instructions with respect to the brief, vague, and general statements challenged here, particularly in the context of Appellant's lengthy history of violent felony convictions. The Commonwealth presented undisputed evidence that Appellant's history of violent felony convictions included the following: in Cumberland County, three burglary convictions, two robbery convictions, and one criminal conspiracy conviction, all in mid–1990; in Franklin County, one robbery conviction, in July 1990; in Clearfield County, one voluntary manslaughter conviction, in the death of Dustin Spotz, in 1995; in Schuylkill County, a first-degree murder conviction, as well as convictions for kidnapping, robbery, aggravated assault, and robbery of a motor vehicle, in March 1996. *See* N.T. Penalty Phase, 4/23/96, at 16–59. Given this undisputed lengthy history of violent felonies, there is no reasonable probability that the outcome of the proceedings would have

been different but for counsel's failure to request curative instructions with respect to the brief, vague, and general comments of which Appellant complains. *See Spotz VI*, 18 A.3d at 284–87 (citing Appellant's lengthy record of violent felony convictions in holding that he did not suffer prejudice from counsel's failure to object to a brief remark by the prosecutor about Appellant's burglary convictions). Counsel was not ineffective, and Appellant is entitled to no relief.

In sub-issue 6(f), Appellant asserts that the prosecutor improperly told the jury that its guilt-phase verdict constituted proof of aggravating circumstance 42 Pa.C.S. § 9711(d)(6), killing committed during the perpetration of a felony. Specifically, Appellant challenges the following statements by the prosecutor during his penalty phase closing argument.

> First aggravating circumstance that the Commonwealth submits for your consideration is the fact that the killing was committed in the perpetration of a felony.

> Your burden is to find that circumstance beyond a reasonable doubt. And to a degree, to a large degree, to the ultimate degree, you have already made that determination. You have found [Appellant] guilty of murder in the first degree, kidnapping, robbery of a motor vehicle, and robbery. That determination is in the bank.

N.T. Penalty Phase, 4/24/96, at 365.

Appellant contends that, with this argument, the Commonwealth relieved itself of its obligation to prove every element of this aggravating circumstance. Appellant's assertion is entirely untenable. The prosecutor stated that the aggravating circumstance was submitted for the jury's "consideration" and that the standard of "beyond a reasonable doubt" was applicable. The prosecutor then argued in favor of this aggravating factor based on the jury's guilt-phase verdict, using rhetorical flair that remained well within acceptable boundaries. There was no prosecutorial misconduct.

Furthermore, the trial court gave clear instructions to the jury regarding the proof of aggravating factors in general and factor 9711(d)(6) in particular.

> With regard again to the aggravating circumstances, they must be proved to your satisfaction beyond a reasonable doubt.
>
> &ast; &ast; &ast;
>
> In this case, the Commonwealth has set forth for your consideration the following aggravating circumstances: [Appellant] committed a killing while in the perpetration of a felony. A felony under the law could be kidnapping or robbery either of personal property or an automobile. You would have to be satisfied from the evidence that you have already heard that the killing did occur while [Appellant] was committing such an offense.

N.T. Penalty Phase, 4/24/96, at 398–99.

We presume that the jury follows the court's instructions, and the instructions here were clear. Appellant's derivative claim of ineffectiveness of counsel in this sub-issue has no arguable merit.[33]

In sub-issue 6(g), Appellant asserts that Mr. Rebert, the chief prosecutor, injected his personal opinion as to the severity of the abuse and dysfunction in Appellant's childhood home, thereby violating Appellant's Sixth, Eighth, and Fourteenth Amendment rights. Appellant's Brief at 42–43. Appellant specifically cites the following excerpt of the penalty phase cross-examination of Molly Muir, the Clearfield County Children and Youth Services ("CYS") administrator who had

33. Appellant also argues in this sub-issue that proof of aggravating factor 9711(d)(6) "requires that the Commonwealth prove beyond a reasonable doubt that the defendant *actually committed* the killing, which cannot be established by a guilt-phase verdict that may, as in this case, rest on a jury finding of accomplice or conspiracy liability." Appellant's Brief at 42 (emphasis in original). Appellant further asserts that counsel were ineffective for failing to object to the prosecutor's statement of law and for not requiring a clarification of the elements of factor 9711(d)(6). The underlying facts and legal premise behind this claim are the same as in Issue 8; accordingly, we have addressed the claim in that issue. *See infra.*

been called to testify as to the agency's contact with Appellant and his family.

*Mr. Rebert:* But I mean as far as the Newpher residence [Appellant's childhood home] was concerned[,] there was never a time that Children and Youth exercised one of their emergency orders to get those kids out of the Newpher residence?

*Witness:* Correct.

*Mr. Rebert:* So it wasn't so bad that you had to file one of those emergency petitions, correct?

*Witness:* It would appear that way.

*Mr. Rebert:* You work with a lot of kids, don't you?

*Witness:* Yes. And the reason that I'm having difficulty answering that is because standards have changed through the years. So what might be different now—how we might deal with something differently now than what was dealt with back then, but the Agency didn't take any of those kinds of actions back then.

*Mr. Rebert:* Well, I was solicitor for that Agency about the same time you're talking about so how have they changed?

*Witness:* Community standards.... [C]ommunity standards kind of dictate how often an agency is going to take some actions with different families.

N.T. Penalty Phase, 4/23/96, at 212–13.

Contrary to Appellant's assertion, these excerpts of testimony do not indicate that Mr. Rebert injected his personal opinion and experience to challenge Ms. Muir's testimony. The prosecutor was certainly trying to probe the severity of the dysfunction and abuse in Appellant's childhood home by focusing on the agency's apparent failure to remove the children via an emergency order. This was a proper line of questioning, and the prosecutor did not inject his opinion into Ms. Muir's answers, including her response that standards had changed over the years. The prosecutor's passing comment that he was solicitor for the agency may have been unnecessary, but it does not constitute an opinion. There is

no merit to Appellant's assertion of prosecutorial misconduct or his derivative claim of counsel ineffectiveness.[34]

In sub-issue 6(h), the final sub-issue in Issue 6, Appellant claims that the prosecutor improperly argued that a death sentence was appropriate as retaliation both for the victim and for women in general, in violation of Appellant's Sixth, Eighth, and Fourteenth Amendment rights. Appellant specifically cites the following comments by the prosecutor, which we have placed in context, from his penalty-phase closing argument.

> We are calling Mark Spotz to account. Mark Spotz deserves a fair trial. That he has received. This is his day in court. We are calling him to account for his offenses, for his crimes. He deserves that fair trial, and that's what he got.
>
> What we are asking you to do is to *show him the same respect for women that he showed to Penny Gunnet. We are asking you to put him to death.* Thank you.

N.T. Penalty Phase, 4/24/96, at 371–72 (emphasis added to portion quoted in Appellant's Brief at 43).

Appellant asserts that, with the above comment, the prosecutor improperly invoked the gender of the victim and issued "a blatant cry for vengeance calculated to appeal to the prejudices of the jury [and to] divert the jury from its duty to decide the case on the evidence." Appellant's Brief at 43 (internal quotation marks and citation omitted). We disagree, and consistent with our precedent, we conclude that the challenged remarks were within the bounds of oratorical license that is permissible when the prosecutor is arguing for the death penalty.

As we recently summarized in *Paddy*, 15 A.3d at 461, this Court has consistently held that a prosecutor does not

---

34. Appellant also asserts in this sub-issue that the prosecutor offered his personal opinion that the witness was not being truthful and "inject[ed] not-of-record comments" into the proceeding. Appellant's Brief at 42–43. These assertions are not explained, not developed, and not supported factually or legally. To the extent that these assertions are comprehensible, they are meritless.

exceed the permissible bounds of oratorical license when he or she asks the jury to show a defendant the same mercy and/or sympathy that the defendant showed to the victim. Here, the prosecutor was expressing much the same sentiment when he asked the jury to show Appellant the same "respect" that he showed for Ms. Gunnet. We see no logical reason to distinguish the prosecutor's statement here from our allowed precedents, as summarized in *Paddy, supra.* Furthermore, although the prosecutor's statement is somewhat oddly constructed and not entirely comprehensible, we do not conclude that his addition of the words "for women" transformed the argument for imposition of the death penalty into one based on gender. There is no merit to Appellant's assertion of prosecutorial misconduct, and, accordingly, no arguable merit to his derivative claim of ineffective assistance of counsel.

Following thorough review of all of Appellant's sub-issues in Issue 6, we conclude that he is entitled to no relief.

### Issue 7: Investigation, Development, and Presentation of Mitigating Evidence

In Issue 7, Appellant claims that counsel were ineffective for failing to investigate, develop, and present all the available evidence of mitigation. In Appellant's view, "counsel only did the most superficial of investigations and failed to uncover voluminous records," resulting in the presentation of "only a shell of the mitigation that could have been presented." Appellant's Brief at 45, 56. More specifically, Appellant asserts that counsel failed to present dispositive evidence of the childhood abuse and violence suffered by Appellant, the sadistic and perverted home environment in which he grew up, his true psychiatric diagnoses, the severity of and reasons behind his substance abuse, and his family history of mental illness. *Id.*

Following an extensive hearing, the PCRA court rejected this claim, first pointing out that, during the penalty phase of Appellant's trial, testimony in mitigation was received from numerous witnesses, including Jean Redden, Appellant's

grandmother; Jean Newpher, his mother; Molly Muir, his family's caseworker and CYS administrator; and Stephen Ragusea, Ph.D., a forensic psychologist who was retained by defense counsel to evaluate Appellant. *See* PCRA Court Opinion at 15–16. Based on the penalty-phase testimony, the jury found two mitigating circumstances, to wit, 9711(e)(2), under the influence of extreme mental or emotional disturbance; and 9711(e)(8), character of the defendant and circumstances of his offense, including a bad childhood. *See Spotz II*, 756 A.2d at 1147 n. 9. The PCRA court compared the penalty-phase testimony of Ms. Redden, Ms. Muir, and Dr. Ragusea to their respective PCRA hearing testimony,[35] and determined that the PCRA testimony was cumulative of the evidence presented at trial. *See* PCRA Court Opinion at 16–20. In addition, the PCRA court expressly found portions of Ms. Redden's PCRA hearing testimony "incredible and not convincing." *Id.* at 16. The PCRA court also recognized that Appellant had raised similar claims in his collateral appeals of his first-degree murder convictions in Cumberland and Schuylkill Counties. *Id.* at 17–19 (citing *Spotz V*, 896 A.2d at 1225–35; *Commonwealth v. Spotz*, No. 794 Criminal 1995, Opinion, dated 6/28/08, at 42–46 (Cumberland County Court of Common Pleas) (Bayley, J.)). The PCRA court determined that the decisions of this Court in *Spotz V* and of the Cumberland County Court of Common Pleas were applicable to the claims raised by Appellant here. *Id.* In conclusion, the PCRA court determined that the outcome of the penalty phase would not have been different had the cumulative evidence been presented, and, accordingly, held that there was no merit to Appellant's claim of ineffective assistance of counsel for failing to investigate, develop, and present additional evidence of mitigation. *Id.* at 20.

Before reviewing Appellant's multiple claims in this issue, we emphasize that Appellant raised similar, if not identical, claims before this Court in his unsuccessful Cumberland County and Schuylkill County PCRA appeals. *See Spotz VI, supra* at 305–20; *Spotz V, supra* at 1225–37. As we explained

---

**35.** Jean Newpher did not testify at the PCRA hearing.

in those prior cases, Appellant's defense counsel in his three capital murder trials in three counties organized and carried out a joint investigative effort, with shared responsibility for investigation of his background for mitigation purposes. *Spotz VI, supra* at 306; *Spotz V, supra* at 1230–33. Appellant's institutional records were collected as part of this tri-county cooperative defense effort. *Spotz V, supra* at 1233. At the PCRA hearing in the instant case, Mr. Blocher, Appellant's trial counsel, confirmed the tri-county collaborative effort with regard to mitigation efforts, including the collection and sharing of institutional records and the sharing of the psychologist expert witness, Dr. Ragusea, as well as of an investigator.[36]

 Our review of Appellant's claims is guided by well-established legal principles regarding counsel's duty to investigate evidence of mitigating circumstances.

It is well established that capital defense counsel has a duty to undertake reasonable investigations or to make reasonable decisions that render particular investigations unnecessary. In the context of the penalty phase, trial counsel has an obligation to conduct a thorough investigation of the defendant's background, particularly with respect to the preparation and presentation of mitigation evidence. This obligation includes the duty of penalty phase counsel to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor. The reasonableness of a particular investigation depends upon evidence known to counsel, as well as evidence that would cause a reasonable

---

**36.** Mr. Blocher testified that he met with Taylor Andrews and Kent Watkins, Appellant's counsel in, respectively, his Cumberland County and Schuylkill County first-degree murder trials. N.T. PCRA Hearing, 9/17/07, at 82. Mr. Blocher also testified that Mr. Andrews found psychologist Dr. Ragusea, who testified as a mitigation expert in all three capital cases. *Id.* at 86, 95–96. The three defense attorneys also shared an investigator, a retired state trooper who simultaneously investigated both mitigating circumstances and facts relevant to the guilt phase of trial. *Id.* at 96–97, 101, 105. Finally, Mr. Blocher testified that all institutional records were shared among defense counsel in the three counties as well as with Dr. Ragusea. *Id.* at 96, 116.

attorney to conduct a further investigation. At the same time, counsel's obligations do not require an investigation into every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing.

\* \* \*

■ The reasonableness of counsel's investigation and preparation for the penalty phase, of course, often depends critically upon the information supplied by the defendant. Counsel cannot be found ineffective for failing to introduce information uniquely within the knowledge of the defendant and his family [that] is not provided to counsel.... [D]ifferent light falls upon counsel's performance depending upon whether counsel asked and was not told, or alternatively, whether counsel did not ask and therefore was not told. *Spotz VI*, 18 A.3d at 305–06 (internal citations omitted).

■ Finally, we have consistently held that counsel cannot be deemed ineffective for failing to present mitigating evidence that would have been merely cumulative of evidence presented during the penalty phase. *Commonwealth v. Chmiel*, 612 Pa. 333, 30 A.3d 1111, 1161 (2011); *Commonwealth v. Miller*, 605 Pa. 1, 987 A.2d 638, 667 (2009); *Spotz V, supra* at 1231, 1232. We proceed now to consider each of the six sub-issues that Appellant raises within Issue 7.

■ In his first sub-issue, Appellant asserts that, because of counsel's allegedly deficient investigation, the jury did not hear "powerful, corroborating evidence of ongoing physical and sexual abuse of [Appellant]." Appellant's Brief at 46. Appellant offers several lines of evidence in this regard that counsel allegedly did not investigate or develop, and hence did not present. First, Appellant proffers CYS and hospital records that, he claims, document the following: (1) medical treatments that Appellant received for injuries consistent with abuse and neglect; (2) assaultive conduct against Appellant and other family members by his brother Dustin; and (3) multiple reports of family abuse, neglect, and mental illness. *Id.* Appellant fails to identify or discuss any particular docu-

ments in these voluminous records; he merely avers, without benefit of argument or explanation, that the records in total constitute "compelling" and "highly mitigating" evidence that allegedly verified the abuse suffered by Appellant, explained the origins of his mental impairments, and would have undermined the weight the jury attached to Appellant's killing of his brother. *Id.* at 47. Our review of these records proffered by Appellant indicates, consistent with the conclusion of the PCRA court, that they are merely cumulative of the evidence proffered by defense counsel and admitted during the penalty phase of Appellant's trial.[37] This Court reached the same conclusion with respect to the similar, if not identical, claims that Appellant raised in his PCRA appeals in Cumberland and Schuylkill Counties. *See Spotz VI, supra* at 306–12; *Spotz V, supra* at 1230–1233.

█ Appellant also attempts to rely on the PCRA testimony of Ms. Redden, his grandmother. To place her PCRA testimony in proper perspective, it is important to recognize that Ms. Redden had provided extensive mitigation testimony during the penalty phase of Appellant's trial. Specifically, she described Appellant's unstable and dysfunctional childhood home environment, where one of his stepfathers taught him to smoke marijuana as a young child, drugs and alcohol were purchased instead of food, finances were dire, and Appellant and his brother Dustin were frequently hungry. N.T. Penalty Phase, 4/23/96, at 61–73. During her penalty-phase testimony,

---

37. The CYS records (Defense PCRA Exhibit 10) proffered by Appellant are in excess of 1,000 pages and primarily concern his brother, Dustin Spotz. The hospital records proffered by Appellant are from three different hospitals, to wit, Warren State Hospital, Clearfield–Jefferson Community Mental Health Center, and Clearfield Hospital. *See*, respectively, Defense PCRA Exhibits 11, 12, and 21. The first two of these are Dustin's records, respectively from his 1990 admission to Warren State Hospital because of suicide threats while in the county jail, and from childhood visits to Clearfield–Jefferson Mental Health Center for various behavioral issues. The records from Clearfield Hospital are Appellant's childhood medical records from 1974 to 1987. These records are, at the very least, similar to records proffered by Appellant to support similar claims in his previous collateral appeals in Cumberland County and Schuylkill County, respectively. *See Spotz VI,* 18 A.3d at 313 & n. 40; *Spotz V,* 896 A.2d at 1230–33.

Ms. Redden also relayed how Appellant and his brother had come to live with her for approximately two years after CYS became involved with the family. *Id.* at 73–74. She testified that both children were "emotionally upset" and embarrassed, with Appellant exhibiting loss of bowel control that required medication, and Dustin unable to control urination. *Id.* at 75–76. In addition, she recalled that when he was very young, Appellant had "counseling and . . . was put on some kind of emotional medication." *Id.* at 88. She also testified that both children told her that their stepfather hit them with what he called "the enforcer," a thick, wide, long piece of leather; Dustin showed her his naked buttocks, which were "streaked." *Id.* at 80–81. Appellant's biological father was also abusive toward him, and Dustin would wrestle with Appellant and hurt him. *Id.* at 82, 90. With regard to sexual abuse, Ms. Redden's penalty-phase testimony described an incident where Appellant, at five years old, told her that Dustin had started to "touch" him. *Id.* at 81.

Much of Ms. Redden's PCRA testimony was duplicative of her penalty-phase testimony. The primary difference was that in her PCRA testimony Ms. Redden explicitly and graphically described several instances of sexual abuse suffered by Appellant in his home at the hands of his mother, stepfather, and brother. N.T. PCRA Hearing, 9/17/07, at 22, 24–27. When PCRA counsel asked Ms. Redden if she would have talked about these incidents of sexual abuse at Appellant's penalty hearing, she testified that she would have, but that "sexual abuse was never an issue" at the penalty hearing and that "there was never any occasion [on which she] was asked to testify on anything but physical abuse." *Id.* at 46. Ms. Redden's assertion is belied by the transcript of the penalty-phase hearing, which reveals that defense counsel asked Ms. Redden if Appellant had told her "of any sexual abuse that might have occurred in the home." N.T. Penalty Phase, 4/23/96, at 81. It was in response to this question that Ms. Redden testified concerning Dustin's "touching" of Appellant, as summarized *supra,* but she did not mention the graphic episodes of sexual abuse that she described during the PCRA

hearing. The PCRA court expressly found Ms. Redden's PCRA hearing testimony "incredible and not convincing." PCRA Court Opinion at 16. We defer to the PCRA court's credibility determination, noting only that, in this case, the PCRA court's credibility determination is very strongly supported by the certified record. We decline to conclude that defense counsel was ineffective for failing to present, at the penalty phase, the graphic examples of sexual abuse presented at the PCRA hearing, when counsel did in fact ask the witness during the penalty phase about incidents of sexual abuse in the home, but was not informed of any, and the PCRA court found the PCRA testimony incredible. *See Spotz VI* at 305–06 and citations therein.

Finally, Appellant attempts to rely on the PCRA hearing testimony of Dr. Blumberg, who testified that Appellant had reported sexual abuse by his mother and stepfather, which was consistent with some of his behavior as well as the reports by his grandmother. N.T. PCRA Hearing, 9/18/07, at 334, 350–55. Appellant fails to consider the substantial evidence that defense counsel presented during the penalty phase concerning the abuse suffered by Appellant as a child.[38] We have already summarized his grandmother's penalty-phase testimony, which was largely focused on the abuse suffered by Appellant and Dustin. *See* text *supra.* In addition, Appellant's mother, Jean Newpher, testified at the penalty-phase hearing as to the abuse perpetrated upon her sons in her home. For example, she testified that Darrall Newpher, their stepfather, had burned Dustin's hand with a book of matches, had required Appellant to play "bartender," and had showed the boys how to smoke marijuana when they were respectively eight and nine years of age. N.T. Penalty Phase, 4/23/96, at 110–13, 118–19. Mr. Newpher confirmed that he had smoked marijuana with Appellant as a child in order to "let him know ... what it was like to do drugs," but "it didn't quite work out." *Id.,* 4/24/96, at 254. Ms. Newpher further testified that the children observed drug and alcohol parties in her home.

---

**38.** Defense counsel called a total of 17 witnesses at the penalty-phase hearing.

*Id.*, 4/23/96, at 143–44, 150. In addition, according to Ms. Newpher, a woman who lived with the family for some time "was constantly flashing different body parts" at Appellant when he was 13 years old. *Id.* at 121–22. Ms. Newpher also testified as to Dustin's violent episodes, fits of rage, and brutal attacks on Appellant with a variety of different weapons. *Id.* at 128–29, 134–36, 140–41, 145.

Several extended family members testified during the penalty phase as to the abusive, unsuitable conditions in Appellant's childhood home, including Lorraine Page, Appellant's great-aunt, who eventually adopted Appellant's younger half-sister; and Nancy Jo Dale, Appellant's second cousin and baby-sitter, who brought food to Appellant and Dustin in their home, and testified that they had appeared at her house late one night, wanting to come in because their stepfather had punished them by putting their hands on the furnace. *Id.* at 96, 98–100, 179–82. Two of Appellant's cousins by marriage, Anna Miller and Tonya Oakes, testified that Dustin had sexually molested them and their sisters, but Appellant had helped them. *Id.*, at 163–64; *id.*, 4/24/96, at 225–26.

Molly Muir, an administrator for CYS and a caseworker for Appellant's family, testified as to the continuing instability, dysfunction, aggressive physical discipline, and lack of life's necessities in Appellant's childhood home. CYS contact with the family began in 1977, when Appellant's mother indicated that she was unable and unwilling to care for her sons and requested placement. N.T. Penalty Phase, 4/23/96, at 186–87. CYS's records indicated that Ms. Newpher did not feel any love toward her sons, and that severe family dysfunction was ongoing. *Id.* at 187, 194, 197. Although Appellant and Dustin were placed with Ms. Redden, the case file was closed in 1979, after Ms. Newpher moved out of state with her sons. *Id.* at 188, 193. In 1982, CYS again became involved with the family following an emergency room report that Appellant had been injured by his stepfather. *Id.* at 194. Ms. Muir testified that CYS's records continued to indicate that Appellant and Dustin "were essentially incorrigible, that [Ms. Newpher] wasn't able to manage their behavior, was unable to care for them, didn't

want to care for them." *Id.* In January 1985, both boys ran away because they were being beaten. *Id.* at 198. At that point, there was a private agreement that custody of Appellant would be transferred to other relatives, to wit, Mr. and Ms. Dale; however, the Dales were unable to manage Appellant's behavior. *Id.* at 199. CYS again became involved with Appellant after an "abandonment," *i.e.,* after Ms. Newpher refused to retrieve him from the Dale's home. *Id.* at 199–200. Appellant then proceeded through a series of foster homes. *Id.* at 200–02. In August 1985, Appellant's guardian *ad litem* petitioned the court to have him returned home, which action was taken, even though the requirements of CYS's service plan had not been accomplished and despite CYS's objection. *Id.* at 203–05, 213–14.

Dr. Ragusea, the forensic psychologist who evaluated Appellant in the fall of 1995, testified during the penalty phase that Appellant's family was "full of violence [and the] children were frequently abused." N.T. Penalty Phase, 4/24/96, at 293. In his PCRA testimony, Dr. Ragusea testified in general terms that the abuse suffered by Appellant was "more severe" than he had thought at the time of trial. N.T. PCRA Hearing, 6/11/08, at 559.

Having reviewed all of the evidence presented at the penalty phase and the PCRA hearing, we conclude that the certified record supports the PCRA court's conclusion that the additional evidence and testimony presented at the PCRA hearing are merely cumulative of the evidence of abuse presented at the penalty-phase hearing. Accordingly, there is no merit to Appellant's assertion that counsel was ineffective for failing to preserve, develop, and present additional mitigation evidence of physical and sexual abuse. *See Miller,* 987 A.2d at 667 (reiterating that counsel is not ineffective for failing to present mitigating evidence that is merely cumulative); *Spotz V, supra* at 1231, 1232.

In his second sub-issue of Issue 7, Appellant asserts that counsel did not investigate, develop, and present evidence of Dustin's mental illness and violent behavior toward Appellant. Appellant argues that such evidence would have diminished

the impact of Appellant's voluntary manslaughter conviction as an aggravating circumstance. Appellant's Brief at 48.

Appellant ignores the considerable evidence that was admitted at trial concerning Dustin's mental health problems and violent behavior, particularly toward Appellant. Ms. Redden testified that Appellant was "scared to death of bigger kids because of his brother" Dustin, who was larger than Appellant and who wrestled with Appellant and hurt him. N.T. Penalty Phase, 4/23/96, at 82. Ms. Newpher, the mother of both Appellant and Dustin, testified extensively about Dustin's violent outbursts, relating in detail several incidents involving Appellant. In one incident in 1989, Dustin walked into their house; flew into a rage, accusing Appellant of some minor slight; grabbed and twisted his mother's arm and threatened to break it; and then stabbed Appellant in the hand with a knife when he tried to intervene. *Id.* at 128–29. Appellant required stitches for the wound. *Id.* at 129. Describing another incident, she testified as follows:

> Next thing you know Dustin gets mad because Dustin would go into fits of rages for no reason in particular. He would just flip out. He would start kicking, punching, biting, pulling his hair—pulling [Appellant's] hair, scratching him, pick him up upside down and let his feet fly out from underneath him with [Appellant's] head between his knees and drop [Appellant] on his head on the floor and stovepipe his neck. It's called a pile driver. The television says don't practice this at home it could be dangerous.

*Id.* at 135.

Ms. Newpher testified that Dustin "brutalized" Appellant, explaining that Dustin physically attacked him, using a variety of weapons, including a knife, a baseball bat, or rocks, sometimes doing so under the guise of helping him. *Id.* at 133–34, 141. Ms. Newpher made clear that such behavior was not unusual for Dustin, who consistently was the aggressor. *Id.* at 129, 135–36; *see also id.* at 145 (on cross-examination, testifying that Dustin "beat up on [Appellant] on a regular basis[,] not occasionally"). When asked if Dustin had any religious beliefs, her answer was "Satanic." *Id.* at 137. She

described Dustin's personality as "schizophrenic," explaining as follows:

> An example is he [Dustin] could hug me, mom, I love you so much, push me away, you G–D bitch, and slap me across the face. He had instant mood swings. It was like different personality [sic]. One second he could be so sweet and loving and nice[,] and the next second he was making statements, I'll tear your heart out and eat it in front of you.

*Id.*

Dustin's violence toward other members of the extended family was established by two of Appellant's cousins by marriage, who testified that Dustin had sexually molested them and their sisters. *Id.* at 163–64; *Id.*, 4/24/96, at 225–26.

It was also clear from penalty-phase testimony that numerous attempts had been made, via the intervention of CYS and other institutions, to help Dustin and his family with his mental health issues. Ms. Newpher testified that Dustin had been in a home for delinquent boys. *Id.*, 4/23/96, at 123. Ms. Muir testified that, through her duties as a caseworker for CYS, she had "very frequent" contact with Dustin, who "was verbally threatening [and] angry most of the time." *Id.* at 196, 215. In addition, Ms. Newpher described the following incident involving a different, unidentified caseworker from youth services.

> Youth services had a caseworker with us because Dustin was a chronic runaway. The young lady came over, very very petite, right out of college. I do not recall her name. Something was said and Dustin looks at the girl and says, I'll show you how crazy I can be. And he went out and got a butcher knife and started running around the house with it and chased [Appellant] upstairs with the knife. [Appellant] locked himself in the bathroom. Came back downstairs and the girl is screaming, take it away, take it away, get it away from him. My husband had to pin Dustin on the floor on his stomach with a knee in the middle of his back to wrestle the knife out of his hand before somebody got hurt, and she just—this young lady threw up her hands and said

this is not a textbook case, I can't handle it, and she never came back.

*Id.* at 140–41.

In light of all of this testimony, Appellant's assertion that counsel was ineffective for failing to present even more evidence of Dustin's violent behavior and mental health problems has no arguable merit. The additional evidence relied upon by Appellant in this sub-issue is merely cumulative of the testimony presented during the penalty phase, and counsel is not ineffective for failing to present cumulative evidence.

In Appellant's third sub-issue of Issue 7, he asserts that CYS responded "with varying degrees of inadequacy" to numerous allegations of abuse and neglect in the Newpher household. Appellant's Brief at 49. In Appellant's view, "[t]he systemic failure of [CYS] to address [his] needs . . . and the resulting impact on his psychological, psychiatric and emotional development, . . . constitute[ ] compelling mitigation evidence." *Id.* As support for this assertion, Appellant relies on the opinion of Richard Gelles, Ph.D., the Dean of the School of Social Policy and Practice at the University of Pennsylvania, who was retained by PCRA counsel and prepared a report. With regard to Dr. Gelles's opinion, Appellant avers as follows: "[Dr. Gelles] concluded the state welfare agencies, including CYS, failed to investigate, rectify, or redress the needs of Appellant throughout critical development periods of his life[,] . . . ignored [ ] signs [of severe abuse and neglect in the home,] and continued to place [Appellant] in a dangerous environment." *Id.* at 50.

Appellant fails to mention that the Commonwealth objected to Dr. Gelles's testifying, and the PCRA court sustained the objection, refusing to permit Dr. Gelles to testify. N.T. PCRA Hearing, 6/10/08, at 362–63. Appellant does not challenge this evidentiary ruling of the PCRA court, but merely asserts that Dr. Gelles's opinion establishes the claims in this sub-issue. We will not review a claim based on testimony that was not admitted by, and thus was not before,

the PCRA court.[39] *See* Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.").

In Appellant's fourth sub-issue of Issue 7, he asserts that counsel was ineffective for failing to present evidence during the penalty phase regarding Appellant's use of drugs and alcohol, both chronically and at the time of the murders. Specifically, Appellant lists several witnesses "available to counsel [but] not presented," all of whom could have testified as to Appellant's heavy drug use and/or alcohol use. Appellant's Brief at 50. The witnesses listed by Appellant are the same as those he cited in Issue 4, where he claimed that counsel was ineffective for failing to investigate and develop the guilt-phase defense of diminished capacity due to voluntary intoxication. *See* Issue 4, *supra,* for a detailed summary of the PCRA testimony of these witnesses. As we discussed in Issue 4, none of these witnesses provided any insight as to Appellant's state of intoxication **at the time** of Ms. Gunnet's murder. Nonetheless, Appellant argues that their testimony regarding his drug and alcohol use would have supported

39. The Commonwealth objected to Dr. Gelles's testimony on relevance grounds. The PCRA court sustained the objection, ruling that whether CYS had failed Appellant was a conclusion that a lay person could reach. N.T. PCRA Hearing, 6/10/08, at 362–63.

The PCRA court did make Dr. Gelles's affidavit, as well as his testimony during Appellant's PCRA proceedings in Cumberland County, part of the record, reminding defense counsel that "if you argue that my exclusion of [Dr. Gelles's testimony] was improper, you have to show the appellate courts he should be permitted to testify." *Id.* at 363–64. As mentioned in the text, *supra,* Appellant does not challenge the PCRA court's evidentiary ruling with regard to Dr. Gelles, but simply fails to mention it at all.

In his affidavit, Dr. Gelles criticizes CYS for repeatedly returning Appellant and Dustin from various placements to their home after inadequate assessments and evaluations and with inadequate services and monitoring. Affidavit of Richard J. Gelles, Ph.D., dated 2/19/07 (Defense PCRA Exhibit 58). We note only that Dr. Gelles's affidavit is not entirely consistent with the testimony of Ms. Muir, the administrator of CYS and caseworker for Appellant and his family. At the PCRA hearing and during the penalty phase of trial, Ms. Muir testified that, when Appellant or Dustin was in placement, she never recommended that either child be returned to his home. N.T. PCRA Hearing, 6/10/08, at 352–53; N.T. Penalty Phase, 4/23/96, at 203–05, 213–14.

three mitigating circumstances, to wit, subsections 9711(e)(2), under the influence of extreme mental or emotional disturbance; 9711(e)(3), substantial impairment of the capacity to conform conduct to the requirements of the law; and 9711(e)(8), character and record of the defendant and circumstances of the offense ("catch-all" mitigator). Appellant's assertion is without merit, based on our well-established precedent.

In *Commonwealth v. Lester*, 554 Pa. 644, 722 A.2d 997, 1006 (1998), the appellant argued, similarly to Appellant here, that his drug use could be a mitigating factor.[40] In rejecting this argument, we acknowledged that there had been testimony from the appellant's family members concerning his drug problem; however, we emphasized that there had been no evidence that the appellant was using drugs at the time of the murder. Accordingly, we held that the appellant's claim that his drug use constituted a mitigating factor lacked any foundation. *Id.* Consistent with *Lester*, we have also held that a diagnosis of substance abuse combined with a finding of alcohol consumption on the day of the murder do not alone support mitigating factor 9711(e)(2), because they do not establish that the defendant was under an extreme mental or emotional disturbance at the time of the murder. *Commonwealth v. Gibson*, 610 Pa. 332, 19 A.3d 512, 527 (2011) (citing *Commonwealth v. Saranchak*, 581 Pa. 490, 866 A.2d 292, 305 (2005)); *see also Commonwealth v. Rice*, 568 Pa. 182, 795 A.2d 340, 354–55 (2002) (holding that the trial court had properly declined to instruct the jury regarding mitigating circumstance 9711(e)(2), because the appellant had failed to present any evidence that he had been suffering from an extreme mental or emotional disturbance at the time of his offense, even though evidence of his abuse of drugs and alcohol at other times had been admitted). With regard to proving that voluntary intoxication was a mitigating factor under subsection 9711(e)(3), we have applied a stringent standard: the defendant must show that, at the time of the murder, he "was

---

**40.** Exactly which mitigating factor the *Lester* appellant invoked with regard to his drug use was not entirely clear.

overwhelmed or overpowered by alcohol to the point of losing his faculties so as to be incapable of forming a specific intent to kill."[41] *Commonwealth v. Flor,* 606 Pa. 384, 998 A.2d 606, 627 n. 7 (2010) (citation omitted); *Gibson, supra* at 529 (same).

Here, none of the evidence presented at the PCRA hearing supported a finding that Appellant was under the influence of drugs or alcohol at the time of Ms. Gunnet's murder, much less that he was intoxicated to the point of being under extreme mental or emotional disturbance, or to the point of losing his faculties and sensibilities. Thus, the evidence was not supportive of any mitigating circumstances. Counsel was not ineffective for failing to develop and present irrelevant evidence.[42]

**41.** We recognize that this standard appears logically impossible to meet, because, when a penalty hearing is held, the jury has already established that the defendant acted with specific intent to kill. However, as we recently stated in *Gibson,* 19 A.3d at 529 n. 18, the jury may consider voluntary intoxication of a lesser degree under mitigating factor 9711(e)(8), the "catchall" mitigator, but consideration of voluntary intoxication under this subsection does not relieve the defendant of proving that he was voluntarily intoxicated **at the time of the murder.**

**42.** We also note that much of the PCRA testimony concerning Appellant's drug and alcohol use, upon which he attempts to rely in this sub-issue, was cumulative of evidence presented during the penalty phase. As we discussed *supra,* in the first sub-issue of this issue, several penalty-phase witnesses, including Appellant's mother, testified that Appellant was repeatedly exposed as a young child to drug and alcohol use and abuse in his childhood home. *See* text, *supra; see also* N.T. Penalty Phase, 4/23/96, at 122, 143–44 (testimony of Ms. Newpher as to drug and alcohol use in Appellant's childhood homes and his exposure to such use); *id.* at 71–72, 85 (testimony of Ms. Redden as to Appellant's exposure to drugs as a child). Appellant's stepfather even acknowledged smoking marijuana with Appellant when he was nine or ten years old. *Id.,* 4/24/96, at 254–55. Linda Spotz, Appellant's wife, testified that he abused drugs, including marijuana, LSD, and crack cocaine, and also that he sold drugs to earn money. *Id.* at 235–36. Although she disapproved of Appellant's drug use, she acknowledged that Appellant smoked crack, got high, and drank when "things were bad" in order "to cope with life in general." *Id.* at 238. She further acknowledged that he was smoking marijuana and using crack cocaine in January 1995. *Id.* Dr. Ragusea diagnosed Appellant with polysubstance abuse, recognizing his long history of abusing virtually all street drugs. *Id.* at 306–07. He emphasized Appellant's childhood drug use and exposure, and suggested that these experiences at such an early age made it more likely that Appellant would continue to abuse drugs as an adult and experience behavioral abnormalities. *Id.* at 304–05. Dr.

 In Appellant's fifth sub-issue of Issue 7, he asserts that counsel was ineffective for failing to properly investigate, develop, and present mental health mitigating evidence. Appellant focuses on counsel's failure to obtain, and to forward to Dr. Ragusea, certain documents concerning Appellant and his family, including records from various mental health centers, a school, courts of common pleas, and prisons.[43] Appellant

Ragusea also testified that Appellant reported to him that he had used LSD shortly before the fatal fight with Dustin. *Id.* at 316–17. The PCRA testimony concerning Appellant's drug and alcohol usage, as summarized in Issue 4, is largely cumulative of this penalty-phase testimony.

43. The records that Appellant cites are eleven "family records," as follows. *See* Appellant's Brief at 51 n. 22.

Three of the eleven records are Dustin's hospital records, as follows: from Clearfield–Jefferson Community Mental Health Center, documenting Dustin's childhood visits for various behavioral issues (Defense PCRA Exhibit 12); from Conemaugh Valley Memorial Hospital, documenting Dustin's 1986 admission because of suicide ideations and troubles at home and school (Defense PCRA Exhibit 13); and from Warren State Hospital, documenting Dustin's 1990 admission because of suicide threats while in the county jail (Defense PCRA Exhibit 11). One record, from Harrisburg State Hospital, concerns a brief commitment of Danny Spotz, Appellant's biological father, in 1971, after he was arrested for possession of narcotics and driving while under license suspension. (Defense PCRA Exhibit 15). He was released from the hospital with a diagnostic impression of "an inadequate personality with strong oral needs [who] withdraws from the stresses of life through satisfaction of these needs by drug use [and] feels himself a poor example of a male figure. There is no evidence of any psychotic distortion in his thought processes and as a consequence [he] may be released from this hospital." (*Id.* at 14.)
One record, from Clearfield Hospital, contains Appellant's childhood medical records from 1974 to 1987. (Defense PCRA Exhibit 21). There is one school record, from the George Junior Republic School, a record which concerns only Dustin. (Defense PCRA Exhibit 19). It includes a psychological evaluation of Dustin from August 1984, which noted his "seething anger," his depression, his aggression and need for revenge, his emotional instability, his abusive stepfather, and his various placements. The evaluation also concluded that there was no organic impairment evidenced or indicated and Dustin was not felt to be psychotic. (*Id.*, Psychological Evaluation by Carolyn E. Pritchard, Clinical Psychologist, dated 8/6–8/84). The school record also includes a psychiatric evaluation from 1987, in which medication is re-prescribed and structure reinstituted, with the hope that Dustin "can regroup and be successful once again." (*Id.*, Psychiatric Evaluation by Carol Maurer, M.D., dated 3/24/87). The psychiatric evaluation notes the following "Impression:" "Adjustment reaction of adolescence with

argues that because Dr. Ragusea did not have these records, he was unable at the time of trial "to render critical diagnoses and opinions." Appellant's Brief at 51. Appellant raised the same claim in his collateral appeals of his first-degree murder convictions in Cumberland and Schuylkill Counties. *Spotz VI, supra* at 313–15; *Spotz V, supra* at 1233–35. In these prior PCRA appeals, we concluded that there was no merit to this claim, and we come to the same conclusion here, as explained below.

We first must emphasize that Dr. Ragusea testified during the penalty-phase proceedings in considerable detail concerning his assessment of Appellant's mental health. Dr. Ragusea concluded that Appellant is "an individual who is severely disturbed," although Dr. Ragusea acknowledged that Appellant might have been exaggerating his symptoms somewhat during the psychological testing. N.T. Penalty Phase, 4/24/96, at 279. Dr. Ragusea explained that Appellant had high scores in tests "designed to measure psychotic tendencies; bizarre experiences, unusual ways of thinking, unusual ways of relat-

disturbance of emotions and conduct[;] Substance abuse, drugs and alcohol[;] Has antisocial personality traits." (*Id.*)

There are three court records, all concerning offenses committed by Dustin, specifically related to assault and related offenses in 1990 in Cumberland County, and to statutory rape and simple assault in 1992 in Adams County. (Respectively, Defense PCRA Exhibits 14 and 18, 17). One record, from 1993 and 1994, concerns Dustin's imprisonment at SCI–Rockview, and includes reports of his behavioral problems and psychiatric evaluations. (Defense PCRA Exhibit 22). The psychiatric evaluations suggest a diagnosis of adjustment disorder with mixed emotional features, substance abuse, and personality disorder not otherwise specified, with a history of seizure disorder. (*Id.*, Psychiatric Evaluations by Abdollah Nabavi, M.D., dated 10/28/93 and 8/22/94). Finally, one record derives from Appellant's 1995 incarceration in the Clearfield County Jail following the killings of his brother and the three other victims. (Defense PCRA Exhibit 16). This record consists of numerous medical requests and reports documenting treatment of Appellant's shoulder and leg injuries sustained in the fight with Dustin as well as treatment for an eye problem. There are no mental health documents in this report.

Appellant fails to describe, discuss, or even refer to any of these particular records in his argument. He merely lists them all in a footnote with no explanation as to whom they concern, what they entail, or why they are, in his view, significant and relevant. *See* Appellant's Brief at 51 n. 22.

ing to other human beings that are typical of very seriously disturbed individuals." *Id.* at 278. Furthermore, Dr. Ragusea explained that his conclusions were supported by Appellant's background history, specifically by information suggesting that even when Appellant was "a very small child he was extremely paranoid, grossly over suspicious, had a hard time relating with other people." *Id.* at 281. One example that Dr. Ragusea gave was an observation by an individual who had cared for Appellant as a child "during one of those episodes when his mother would throw him out of the house." *Id.* The caregiver said that it was common for Appellant to hide in the closet with the light on in the middle of the night, looking frightened. *Id.* Dr. Ragusea also cited "frequent references[, which were confirmed by Appellant,] throughout the record during [Appellant's] childhood and adolescence of over suspiciousness, of paranoia, of reports of hallucinatory experiences, hearing voices, seeing things that aren't there." *Id.* at 281–82. Dr. Ragusea described Appellant as "an individual who tends to experience difficulties with reality testing [and] doesn't know what's real some of the time." *Id.* at 292. Dr. Ragusea also indicated that drug usage caused further deterioration of Appellant's mental state: "So I would say that given [Appellant's] overall profile[,] traumatic experiences, drug-induced experiences would only keep it more difficult for him to stay glued together." *Id.* at 284. Thus, there is no question that, during the penalty-phase of trial, Dr. Ragusea characterized Appellant, using lay terms for a lay jury, as an individual with severe mental and emotional disturbances that strongly affected his ability to function in daily life.

Finally, using more technical language, Dr. Ragusea further testified during the penalty phase that he had diagnosed Appellant with the following mental health disorders: (1) attention deficit hyperactivity disorder; (2) polysubstance abuse; (3) sexual abuse, physical abuse, and neglect; (4) post-traumatic stress disorder and acute stress reaction related to the killing of his brother; and (5) mixed personality disorder "including features of borderline personality, antisocial personality, and schizotypal features." *Id.,* at 306–11.

At the PCRA hearing, after reviewing the additional records sent to him by PCRA counsel, Dr. Ragusea changed his diagnosis in the following ways: (1) he modified his prior diagnosis of mixed personality disorder, including features of borderline personality, antisocial personality, and schizotypal features, to a diagnosis of borderline personality and schizoaffective disorder; and (2) he changed his diagnosis of post-traumatic stress disorder and acute stress reaction to a diagnosis of pre-existing chronic severe post-traumatic stress disorder that was related to the many traumas Appellant had suffered as a child. N.T. PCRA Hearing, 6/11/08, at 552, 566. Dr. Ragusea reported a similar if not identical modification of diagnoses, prompted by his review of additional records, in his testimony during Appellant's PCRA proceedings in Cumberland and Schuylkill Counties. *Spotz VI, supra* at 313–15; *Spotz V, supra* at 1233–35. Our holding in *Spotz VI* applies equally well here:

> While we do not minimize the potential significance of the revised diagnoses to trained psychologists or psychiatrists involved in mental health treatment, we can locate nothing in the record to suggest that the revisions would have been determinative in the deliberations of the jury. We agree with the PCRA court that Dr. Ragusea's revised diagnoses on collateral appeal constitute no prejudice to Appellant because he has not established that the revisions would have caused the jury to weigh differently the mitigating versus aggravating circumstances.

*Spotz VI, supra* at 315.[44]

Appellant's reliance on one part of Dr. Ragusea's penalty-phase testimony, to wit, his technical diagnoses, ig-

---

**44.** As in *Spotz VI*, Appellant also invokes in this sub-issue the PCRA testimony of two psychiatrists, Dr. Blumberg and Dr. Fox, both of whom evaluated Appellant and reviewed the records after being retained by PCRA counsel. *See* Appellant's Brief at 53–55. Appellant's attempt to rely on the testimony of these experts is unavailing.

Dr. Blumberg, who evaluated Appellant eleven years after the murders, opined that, at the time of the murders, Appellant was suffering from three mental conditions: (1) post-traumatic stress disorder, chronic/severe; (2) personality disorder not otherwise specified with dependent, schizotypal, borderline, and antisocial features; and (3) polysubstance

nores the psychologist's extensive and detailed description of Appellant's mental disabilities, which was delivered clearly and

abuse, including marijuana, LSD, cocaine, and methamphetamine. N.T. PCRA Hearing, 9/18/07, at 315. Dr. Blumberg's diagnosis of chronic, severe post-traumatic stress disorder is similar to the revised diagnosis that Dr. Ragusea set forth during Appellant's PCRA proceedings. However, the two experts appeared to differ with respect to their personality disorder diagnoses. As we have previously noted, Dr. Blumberg explained in his testimony during Appellant's Cumberland County PCRA proceedings that personality disorder not otherwise specified is simply the newer term for mixed personality disorder. *See Spotz VI, supra* at 315 n. 41. Thus, as we concluded in *Spotz VI,* "it would appear that the type of personality disorder diagnosed by Dr. Blumberg for purposes of collateral appeal is very similar to the type *first* diagnosed by Dr. Ragusea, *i.e.,* at the time of trial." *Id.* (emphasis in original).

Dr. Fox, who interviewed Appellant five years and again twelve years after the murders, diagnosed Appellant as suffering from the following psychiatric conditions: (1) post-traumatic stress disorder; (2) borderline personality disorder; (3) an obsessive compulsive disorder; and (4) polysubstance dependence in remission. N.T. PCRA Hearing, 6/9/08, at 36. When asked on direct examination about the difference between himself and Dr. Blumberg with respect to their personality disorder diagnoses, Dr. Fox testified as follows: "[T]here is not a significant difference between Dr. Blumberg's personality disorder diagnosis and mine. We both consider [Appellant] to suffer from a severe personality disorder. It's really away [sic] to describe." *Id.* at 39. Based on the experts' testimony, we fail to see a legally relevant distinction among the personality disorder diagnoses of any of the three mental health experts who testified on Appellant's behalf, nor a distinction that could possibly have been determinative to a jury.

Furthermore, Appellant has failed to explain how or why or what additional records prompted the revised diagnoses. Only the following exchange addresses this question at all. On cross-examination, the prosecutor asked Dr. Fox to explain the reason for the difference in his diagnoses versus Dr. Ragusea's initial diagnoses. The following exchange then took place:

*Dr. Fox:* It [the differing diagnoses reached by him and Dr. Ragusea] was based on additional records and we are different people and, you know, different evaluations.

*Prosecutor:* But you can't as you sit here recall what records made the difference?

*Dr. Fox:* I had more extensive records of the abuse that [Appellant] received in childhood as we have talked about for hours today.

*Id.* at 156.

Thus, although Dr. Fox attributed the differing diagnoses reached by him and Dr. Ragusea at least partially to the additional records, the only specific records that Dr. Fox could recall that led to this difference of opinion were those addressing further the abuse of Appellant during his childhood. As we have already discussed, Appellant's childhood abuse was well documented during the penalty phase of his trial.

in lay terms and was not appreciably altered in Dr. Ragusea's PCRA testimony. Given all the information that the jurors heard concerning Appellant's mental disturbances, we cannot conclude that, if only the jurors had heard the revised technical diagnoses, there is a reasonable probability that they would have reached a different verdict. Thus, as we held in *Spotz VI*, we hold here that there is no merit to Appellant's claim that counsel was ineffective for failing to obtain the additional mental health, criminal, and prison records of Appellant and his family.[45]

In Appellant's sixth and final sub-issue of Issue 7, he asserts that counsel was ineffective for failing to investigate, develop, and present a psychological evaluation of Appellant prepared by the Department of Corrections's chief psychologist, Franklin P. Ryan, Ph.D. Appellant maintains that this evaluation supports a finding that Appellant will adjust well to prison life and is therefore mitigating evidence that should have been presented during the penalty phase. Appellant raised precisely the same claim with respect to precisely the same document in *Spotz VI*, 18 A.3d at 316–19, and *Spotz V*, 896 A.2d at 1235–37. We held that the claim was meritless in those two prior cases, and for all the reasons described therein, we hold that the claim is meritless here.

45. Appellant also broadly asserts in this sub-claim that the history of mental illness documented for his father, mother, and brother was "important mitigation" evidence and "also had an important environmental effect on [Appellant's] development." Appellant's Brief at 52. Appellant neither develops these assertions in any meaningful way nor provides any citations to the record to support them. Appellant offers no rationale or argument to support his apparent belief that if only the jurors had heard more evidence of Appellant's family history of mental illness, they would have returned a different verdict, despite the fact that the jurors heard testimony from multiple witnesses regarding Appellant's chronically abusive and violently dysfunctional family; his mother's depression, instability, and suicide attempts; his absent father and cruelly abusive stepfather; his brother's violent rages, and CYS's attempts to intervene. Under these circumstances, we conclude that it is virtually inconceivable that additional evidence as to Appellant's family history of mental illness would have changed the jury's verdict. Accordingly, there is no merit to Appellant's claim that counsel was ineffective for failing to present such evidence.

### Issue 8: Aggravating Factor (d)(6)

Appellant claims that the trial court erred by failing to instruct the jury that the subsection 9711(d)(6) aggravating circumstance (defendant committed the killing while in the perpetration of a felony) does not apply to a defendant who is convicted of first-degree murder as an accomplice or co-conspirator. Appellant's Brief at 57. During the guilt phase of the trial, the court gave instructions to the jury concerning accomplice liability and co-conspirator liability, reflecting Appellant's defense that Ms. Noland actually shot the victim. N.T. Trial, 4/22/96, at 2052–56. However, the trial court did not instruct the jury that aggravating circumstance 9711(d)(6) is not applicable to a defendant who is convicted under accomplice or co-conspirator liability. Appellant further asserts that counsel was ineffective for failing to object to this omission in the trial court's instructions.

Appellant raised precisely the same claim in *Spotz V*, 896 A.2d at 1237–39. In *Spotz V*, we determined that Appellant's claim of ineffective assistance had arguable merit, based on this Court's holding in *Commonwealth v. Lassiter*, 554 Pa. 586, 722 A.2d 657, 662 (1998) (plurality opinion). However, we ultimately concluded that Appellant was not entitled to relief because *Lassiter* was decided years after Appellant's conviction and sentencing. *Spotz V, supra* at 1238. Because effectiveness of counsel must be evaluated under the standards in effect at the time of performance, and because counsel cannot be deemed ineffective for failing to predict developments or changes in the law, we declined to hold counsel ineffective in *Spotz V* for failing to request a jury instruction under *Lassiter*. The same holding applies here. *See Spotz V*, 896 A.2d at 1237–39.

### Issue 9: Ineffectiveness of Counsel during Penalty Phase

In Issue 9, Appellant includes five sub-issues, related only in that the matters complained of all occurred during the penalty phase of trial and involve allegations of counsel ineffectiveness. Specifically, the sub-issues are that counsel was ineffective for

the following: (a) not objecting to the introduction of Appellant's burglary convictions to support aggravating factor 42 Pa.C.S. § 9711(d)(9); (b) not objecting to or raising the trial court's allegedly unconstitutional restriction on the admission of mitigating evidence from Appellant's grandmother and mother, including the former's plea for mercy; (c) not objecting to the use of Appellant's "constitutionally invalid" convictions in Clearfield and Schuylkill Counties as aggravating circumstances; (d) not objecting to the trial court's explanation to the jury of aggravating and mitigating circumstances; (e) not objecting to the use of Appellant's Clearfield and Schuylkill County convictions to support several different aggravating circumstances.[46] Appellant's Brief at 58–64. We address each sub-issue in turn.

In sub-issue (a), Appellant asserts that counsel was ineffective for failing to object to the admission of Appellant's three burglary convictions to support aggravating factor 9711(d)(9). Appellant raised this matter in Issue 6(e) as a claim of prosecutorial misconduct. We thoroughly addressed the matter in Issue 6, *supra*, concluding that the underlying claim is meritless. There is no need to repeat that analysis here. We add only that, because the underlying claim is meritless, the derivative claim of ineffective assistance of counsel for failing to object has no arguable merit.

In sub-issue (b), Appellant asserts that counsel was ineffective for failing to raise, on direct appeal, claims of trial court error with regard to the limitation of the mitigation testimony of Ms. Redden and Ms. Newpher, Appellant's grandmother and mother, respectively. Admission of evidence is within the sound discretion of the trial court, and we review the trial court's evidentiary rulings for abuse of discretion. *See e.g., Commonwealth v. Flor*, 606 Pa. 384, 998 A.2d 606, 623 (2010). A conclusion that the trial court abused its discretion "requires a result of manifest unreasonableness, or

---

46. In Issue 9, Appellant also raises a sixth sub-issue, to wit, that penalty-phase counsel were "conflicted." Appellant's Brief at 65. This claim is merely a repetition of Issue 1(a), which we have already addressed thoroughly. *See* text, *supra,* Issue 1(a).

partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous." *Commonwealth v. Travaglia,* 611 Pa. 481, 28 A.3d 868, 873–74 (2011) (citation omitted).

■ Appellant challenges the trial court's refusal to admit, as hearsay, the following: Ms. Redden's testimony as to what a school principal had told her regarding CYS's action in taking custody of Appellant and Dustin when they were minors; and Ms. Newpher's testimony that she was told by physicians at Harrisburg Hospital that Appellant's biological father had been mainlining heroin and morphine. N.T. Penalty Phase, 4/23/96, at 74 and 107–08, respectively; *see* Appellant's Brief at 60.[47] Appellant's entire argument with respect to this sub-issue consists of the following single sentence and three citations: "Due process requires the admission of relevant mitigating evidence even if it violates a state law rule against the admission of hearsay. *Sears v. Upton* [—— U.S. ——], 130 S.Ct. 3259, 3263 & n. 6 [177 L.Ed.2d 1025] (2010); *Green v. Georgia,* 442 U.S. 95, 97 [99 S.Ct. 2150, 60 L.Ed.2d

47. Appellant also challenges two other hearsay rulings by the trial court, specifically Ms. Redden's testimony that Dustin had told her that his stepfather hit him and Appellant with a piece of leather that he called "the enforcer;" and Ms. Redden's testimony as to what she had heard about abuse by Appellant's biological father. N.T. Penalty Phase, 4/23/96, at 81 and 89–90, respectively; *see* Appellant's Brief at 60. However, our review of the notes of testimony reveals that Ms. Redden's testimony regarding these matters was admitted when defense counsel asked a follow-up question.

Immediately after the trial court's ruling that what Dustin had told Ms. Redden about being beaten by his stepfather was hearsay, Ms. Redden further testified that Appellant had "said basically the same thing, that [their stepfather] hit them with the enforcer, which was a thick and wide long piece of leather." N.T. Penalty Phase, 4/23/96, at 81. This time, the Commonwealth did not object; there was no ruling, hearsay or otherwise; and the testimony was admitted without comment from the prosecutor or the court. *Id.* at 81. Similarly, immediately after the court sustained the hearsay objection as to what information Ms. Redden had heard about abuse by Appellant's biological father, defense counsel asked Ms. Redden if Appellant had told her of abuse by his biological father. She answered, without objection, that Appellant said his biological father had punched him in the chest. *Id.* at 89–90. Thus, contrary to Appellant's assertion, the testimony by Ms. Redden regarding these matters was heard by the jury. There is no arguable merit to his claim that counsel was ineffective for failing to raise an issue of trial court error regarding these matters on direct appeal.

738] (1979); *see also Chambers v. Mississippi,* 410 U.S. 284, 302 [93 S.Ct. 1038, 35 L.Ed.2d 297] (1973)." Appellant's Brief at 60. None of the alleged authority for Appellant's formulation of prevailing law is accompanied by so much as an explanatory parenthetical. Contrary to Appellant's undeveloped averment, none of the cited cases, or any other precedent of which we are aware, can be interpreted in such a broad, all-encompassing manner.

This Court has recently discussed *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), one of the cases upon which Appellant purports to rely, in the context of Appellant's collateral challenge to a hearsay ruling during his first-degree murder trial in Cumberland County. *See Spotz VI,* 18 A.3d at 274–75. As we stated in *Spotz VI,* the *Chambers* holding did **not** "signal any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures." *Id.* at 275 (quoting *Chambers, supra* at 302–03, 93 S.Ct. 1038). "*Chambers* cannot generally be relied upon to support common, straightforward challenges to hearsay rulings that have correctly applied state criminal procedure." *Id.*

In *Green v. Georgia,* 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979) (*per curiam* ), the Supreme Court, citing *Chambers,* held that the petitioner was denied a fair trial on the issue of punishment, and vacated his death sentence because the trial court had excluded, as hearsay, testimony regarding his co-conspirator's confession that he alone had committed the murder with which both co-conspirators were charged. In concluding that "the hearsay rule may not be applied mechanistically to defeat the ends of justice," the High Court stressed the unique circumstances of the case; the high relevance of the testimony to a critical issue; and the substantial reasons to assume the reliability of the confession, which included ample corroborative evidence, used by the state to obtain a conviction against the petitioner's co-conspirator in a separate trial, and the fact that the confession was a statement against penal interest made spontaneously to a close friend. *Green,*

*supra* at 97, 99 S.Ct. 2150 (quoting *Chambers, supra* at 302, 93 S.Ct. 1038).

Finally, Appellant attempts to rely on *Sears v. Upton,* —— U.S. ——, 130 S.Ct. 3259, 3263 & n. 6, 177 L.Ed.2d 1025 (2010) (*per curiam*), where the High Court cited *Green* and *Chambers* as recognizing that "reliable hearsay evidence that is relevant to a capital defendant's mitigation defense should not be excluded by rote application of a state hearsay rule." The *Sears* Court also noted that it took no position as to whether the evidence at issue in that case "would satisfy the considerations [ ] set forth in *Green,* or would be otherwise admissible under [state] law." *Id.*

Here, Appellant fails to acknowledge—much less apply to the circumstances of his case—the full import and the nuances of the High Court's holdings in *Chambers, Green,* and *Sears.* More specifically, Appellant makes no argument that the testimony at issue would satisfy the considerations set forth by the High Court in *Green* or would be admissible under the law of this Commonwealth. More specifically, Appellant relies on no unique circumstances in his case, declines to explain why the testimony was highly relevant to a specific critical issue, provides absolutely no basis upon which to conclude that the statements at issue were reliable, and offers no potentially applicable hearsay exception. *See Green, supra.* Our review makes clear that the trial court did not mechanistically apply the hearsay rule to defeat the ends of justice, but rather acted well within its discretion in sustaining the Commonwealth's hearsay objections. Thus, because the trial court did not abuse its discretion in ruling that the testimony at issue was inadmissible hearsay, there is no arguable merit to Appellant's derivative claims of ineffectiveness.

Also in sub-issue (b), Appellant asserts that the trial court erred in instructing the jury to disregard Ms. Redden's statement asking that Appellant's life be spared. Appellant's Brief at 60; N.T. Penalty Phase, 4/23/96, at 93. Finally, Appellant challenges the trial court's charge to the jury, asserting that "instead of giving a proper mercy charge, [the trial court] gave essentially an anti-mercy one." Appellant's Brief at 60;

N.T. Penalty Phase, 4/24/96, at 406–07. Appellant's claims of trial court error are waived pursuant to 42 Pa.C.S. §§ 9543(a)(3) and 9544(b), but his derivative claims of ineffectiveness for failing to raise the asserted errors are cognizable.

As this Court has previously explained, Pennsylvania's capital sentencing statute does not permit a jury to consider mercy as a stand-alone factor, unmoored from any evidence admitted in support of a specific statutory mitigator. *Commonwealth v. Powell*, 598 Pa. 224, 956 A.2d 406, 426–27 (2008); *see also Commonwealth v. Zook*, 532 Pa. 79, 615 A.2d 1, 13 (1992) (relying on our capital sentencing statute to conclude that a jury does not have unbridled discretion to grant mercy or leniency); *Commonwealth v. Henry*, 524 Pa. 135, 569 A.2d 929, 941 (1990) (explaining that our capital sentencing statute precludes "absolute mercy verdicts," and requires that a jury's consideration of mercy or sympathy be based upon the evidence). Pursuant to our statute, a capital defendant is permitted to introduce a broad range of mitigating evidence, which the jury then weighs against the aggravating circumstances. During this weighing process, the jury may give consideration to mercy or sympathy, but the jury may not "exercise its sense of mercy or sympathy in a vacuum." *Powell, supra* at 427. We have explained that this rule is essential to avoid arbitrariness in capital sentencing. *Id.*

We have previously held that the testimony of a victim's relative regarding her personal opposition to the death penalty was inadmissible under our capital sentencing statute because it did not constitute evidence relevant to any of the mitigating circumstances of 42 Pa.C.S. § 9711(e). *Commonwealth v. Bomar*, 573 Pa. 426, 826 A.2d 831, 852 (2003). In addition, we have rejected outright the assertion that the court is required to give an instruction on mercy. *Commonwealth v. Bardo*, 551 Pa. 140, 709 A.2d 871, 876 (1998). However, a trial court may instruct the jury that it is permitted to be swayed by sympathy, but **only** when the sympathy

relates to and is derived from the **evidence.** *Henry, supra* at 941.

Here, the trial court did not err in instructing the jury to disregard Ms. Redden's plea that Appellant's life be spared. Ms. Redden made her unsolicited plea at the end of her testimony, not in response to any question, but after she was told by the court to step down from the witness stand. N.T. Penalty Phase, 4/23/96, at 93 ("May I ask that [Appellant's] life be spared[?]"). Her plea to spare Appellant's life was not evidence and was not relevant to any mitigating circumstance; it did not concern the character or record of Appellant, nor the circumstances of his offense. 42 Pa.C.S. § 9711(e)(8). As such, Ms. Redden's plea for Appellant's life was not admissible evidence, and the trial court correctly determined that it should not be considered by the jury.

Furthermore, Appellant's assertion that the trial court gave an "anti-mercy" charge to the jury, and thus erred, is baseless. The trial court properly instructed the jury to decide the case before it not on the basis of feelings or emotions, but rather on the basis of the aggravating and mitigating circumstances, common sense, and human judgment. N.T. Penalty Phase, 4/24/96, at 406–07. Appellant fails to explain his understanding of "a proper mercy charge," which, he asserts, should have been given. We have reviewed the charge actually given by the trial court and conclude that it properly directed the jurors to render a decision based on the evidence and the weighing of mitigating and aggravating circumstances.[48] There was no error.

48. The relevant portion of the trial court's jury charge is as follows: With regard to your determination, you should set aside any feeling or emotion that clouds your judgment just as you did when you reached the initial verdict in this case. Set aside—Feelings or emotions one way or the other with regard to life or death isn't [sic] the issue. The issue here is aggravating and mitigating[,] and use your common sense and human judgment in reaching that decision, and emotion is something that you should set aside and use your common sense and your human mind.
N.T. Penalty Phase, 4/24/96, at 406–07.

Because there was no trial court error, Appellant's derivative claims of ineffective assistance have no arguable merit, and he is entitled to no relief on this sub-issue.

In sub-issue (c), Appellant asserts that his voluntary manslaughter and first-degree murder convictions in, respectively, Clearfield and Schuylkill Counties, were unconstitutionally obtained, as evidenced by, apparently, his pending challenges to these convictions. Therefore, Appellant argues, the use of these prior convictions to support aggravating circumstances was improper and erroneous, and counsel was ineffective for failing to challenge their introduction during the penalty phase.

Appellant raised an analogous claim in *Spotz VI*, 18 A.3d at 283–84 & n. 24, and in *Spotz V*, 896 A.2d at 1224–25. In these prior cases, we held that the claim had no merit, and we reach the same holding here, based on the same rationale.

This Court has expressly held that the term "conviction" means simply "found guilty" when used in the context of the aggravating circumstances set forth in 42 Pa.C.S. § 9711(d). A collateral murder conviction is not divested of its character as an aggravating circumstance merely because it remains at the appeal stage. Only if the conviction is overturned on appeal could an error ensue.

*Spotz VI*, 18 A.3d at 284 (internal citations omitted).

This court has upheld all of Appellant's murder convictions. His voluntary manslaughter conviction remains in appellate proceedings.[49] Thus, Appellant's underlying as-

49. Recently, and well after Appellant filed his PCRA appeal in this Court, a Superior Court panel filed a memorandum opinion vacating his voluntary manslaughter conviction and remanding for a new trial. *See Commonwealth v. Spotz*, 43 A.3d 518, 770 WDA 2010 (Pa.Super., filed January 13, 2012). Shortly thereafter, the Commonwealth filed an application for reargument in the Superior Court. On March 13, 2012, Appellant filed with this Court an "Application Pursuant to Pa.R.A.P. 2501, for Leave to File Post–Submission Communication in the form of a Motion to Amend Claims and Submit Supplemental Briefing, or Remand to the PCRA Court."

While the Superior Court's decision is potentially relevant to Appellant's judgment of sentence in the instant case, there is, as yet, no final

sertions in sub-issue (c) are contrary to the prevailing law of this Commonwealth, and accordingly are meritless. Counsel was not ineffective for failing to raise a meritless claim.

■ In sub-issue (d), Appellant challenges that portion of the trial court's charge to the jury in which the court instructed that aggravating and mitigating circumstances "are things that make first[-]degree murder either more terrible or less terrible." Appellant's Brief at 62 (quoting N.T. Penalty Phase, 4/24/96, at 397). In addition, Appellant claims that counsel was ineffective for failing to object to this portion of the jury instruction.

We have consistently rejected challenges to the inclusion of the concept of "terribleness" in jury instructions regarding

disposition of Appellant's challenge to his voluntary manslaughter conviction because his challenge remains in appellate proceedings. In the event that Appellant's challenge to his voluntary manslaughter conviction is ultimately successful at the close of appellate review, then and only then would consideration of the implications of that successful challenge be appropriate.
As this Court has previously stated,
> [I]f the underlying collateral conviction which forms the basis of an aggravating circumstance found by the jury is ultimately overturned, this Court is not without power to vacate the sentence of death in appropriate circumstances. Nor would we hesitate to stay an execution of sentence pending appellate disposition of the collateral conviction in appropriate circumstances.

*Commonwealth v. Morales*, 508 Pa. 51, 494 A.2d 367, 376 (1985).
At the present time, because there has not been any final disposition of Appellant's challenge to his voluntary manslaughter conviction, there is no reason to delay resolution of Appellant's numerous claims presently before this Court, most of which are entirely unrelated to his voluntary manslaughter conviction. Again, *Morales, supra,* is relevant here:
> As review of a convicted murder's sentence of death is one of the most, if not the most, weighty and important appellate tasks this Court is called upon to perform, it would not serve the interests of justice to withhold swift resolution of our review of a sentence of death pending appellate resolution of a collateral conviction. To do so would subject that resolution to the unavoidable delays possible in the appellate process....

*Id.*
If Appellant's challenge to his voluntary manslaughter conviction is ultimately and finally successful, his recourse is to file a second PCRA petition raising a new claim or claims. *See Commonwealth v. Lark,* 560 Pa. 487, 746 A.2d 585, 588 (2000) (holding that, when an appellant's PCRA appeal is pending, a subsequent PCRA petition cannot be filed until the pending PCRA petition is resolved).

aggravating and mitigating circumstances. *See, e.g., Spotz VI,* 18 A.3d at 282–83, and citations therein. As we recognized in *Spotz VI,* at 282, at the time of Appellant's trial in 1996, the "less terrible" versus "more terrible" comparison was part of a Pennsylvania suggested standard criminal jury instruction. Our review of the entire jury instruction reveals that the trial court properly and clearly explained the general concepts behind aggravating and mitigating circumstances, and also explained each individual circumstance relevant to Appellant's case. Based on the trial court's entire instruction and this Court's ample precedent, we conclude that Appellant's claim of trial court error is meritless, and thus his derivative claim of ineffectiveness has no arguable merit.

In sub-issue (e), Appellant asserts that the trial court improperly permitted the jury to consider his Schuylkill County conviction for first-degree murder as support for three different aggravating circumstances, specifically, 9711(d)(9), significant history of violent felony convictions; 9711(d)(10), convicted of another offense for which a sentence of death or life imprisonment was possible; 9711(d)(11), convicted of another murder. Appellant argues, without benefit of supporting authority, that such "triple-weighing" of the same offense, same facts, and same conduct violates the Sixth, Eighth, and Fourteenth Amendments. Appellant's Brief at 63–64.

This Court previously rejected a similar argument in *Commonwealth v. Lesko,* 553 Pa. 233, 719 A.2d 217, 224 (1998), where the appellant's prior murder convictions were used to support aggravating factors 9711(d)(9) and (d)(10).

> [Subs]ection (d)(10) allows the jury to consider as aggravating circumstances another Federal or State offense for which a sentence of life imprisonment or death was imposable . . ., and (d)(9) allows the jury to consider as aggravating circumstances a significant history of felony convictions involving the use of violence. **Nothing in the statute provides that a criminal conviction may be considered under only one sub-section.** [The murders of which the appellant was convicted] fit under both (d)(9) and (d)(10), and were, therefore, properly considered by the jury as

presenting aggravating circumstances under both (d)(9) and (d)(10).

*Lesko, supra* at 224 (emphasis added) (internal quotation marks omitted).

Based on *Lesko,* we conclude that the trial court committed no error in allowing Appellant's prior first-degree murder conviction to be used as support for three aggravating circumstances. Accordingly, there is no arguable merit to Appellant's derivative claim of ineffective assistance.

Having reviewed each of Appellant's sub-issues in Issue 9, and holding that all are meritless, we conclude that Appellant is not entitled to relief on this issue.

### Issue 10: Life Without Parole Instruction

Appellant asserts that the trial court erred by not instructing the jury that a defendant who receives a life sentence for first-degree murder is statutorily ineligible for parole, and that trial counsel was ineffective for not objecting to the trial court's omission of this instruction. Appellant argues that the lack of the instruction violated his Sixth, Eighth, and Fourteenth Amendment rights. Appellant's Brief at 66. Appellant relies on *Simmons v. South Carolina,* 512 U.S. 154, 156, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994) (plurality), in which a plurality of the United States Supreme Court held that "where the defendant's future dangerousness is at issue and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible." It is well established that a *Simmons* instruction is triggered only when a defendant's future dangerousness has been placed at issue and the defense has requested an instruction as to parole ineligibility. *See, e.g., Spotz VI, supra* at 299; *Spotz III,* 759 A.2d at 1291 & n. 14. In *Shafer v. South Carolina,* 532 U.S. 36, 121 S.Ct. 1263, 149 L.Ed.2d 178 (2001), the High Court clarified *Simmons's* holding as follows: "[W]here a capital defendant's future dangerousness is at issue, and the only sentencing alternative to death available to the jury is life imprisonment without possibility of parole, due process entitles the defendant to

inform the jury of his parole ineligibility, either by a jury instruction **or in arguments by counsel.**" *Shafer, supra* at 39, 121 S.Ct. 1263 (internal quotations marks and citation omitted) (emphasis added).

Here, during closing argument, defense counsel made the following argument:

> [Appellant's intelligence] is important because what we're asking you to do is to impose a life sentence, a sentence whereby [Appellant] would spend the rest of his life with **no possibility of parole,** incarcerated to sit and to think about all the things that he's done in his life. This would not be something that would be put aside. This would be something that he could think about every day for the rest of his natural life.
>
> \* \* \*
>
> I would submit to you that [Appellant] can be accountable while serving a life sentence in prison for the rest of his life.

N.T. Penalty Phase, 4/24/96, at 390, 392 (emphasis added).

Thus, defense counsel explicitly informed the jury that a life sentence for Appellant meant that he would be imprisoned for the rest of his life with no possibility of parole. Defense counsel's statement is sufficient to satisfy the requirements of *Simmons* and *Shafer.* Because defense counsel informed the jury of Appellant's ineligibility for parole from a life sentence, there is no arguable merit to Appellant's claim that counsel was ineffective for failing to request a court instruction to the same effect.

### Issue 11: Cumulative Effect of Alleged Errors

In its entirety, Appellant's final claim is the following:

The cumulative effect of the errors described require relief as they render Appellant's conviction and death sentence fundamentally unfair. *Kyles v. Whitley,* 514 U.S. 419, 437–38 [115 S.Ct. 1555, 131 L.Ed.2d 490] (1995); *Commonwealth v. Sattazahn* [597 Pa. 648], 952 A.2d 640, 670–71 (Pa.2008). Although Appellant is entitled to relief on each of those claims individually, it is unquestionable that the cumulative

prejudice from the combination of court error, improper actions by the prosecution, and deficient performance by counsel at both the trial and appellate stages entitle[s] Appellant to relief.

Appellant's Brief at 69. The PCRA court denied this claim, finding that Appellant's argument lacked merit. PCRA Court Opinion at 25–26.

Appellant raised a similar claim in *Spotz VI*, and in that case, we explained the relevant legal principles as follows:

We have often held that no number of failed [ ] claims may collectively warrant relief if they fail to do so individually. However, we have clarified that this principle applies to claims that fail because of lack of merit or arguable merit. When the failure of individual claims is grounded in lack of prejudice, then the cumulative prejudice from those individual claims may properly be assessed.

*Spotz VI, supra* at 321 (internal question marks and citations omitted).

■■■ However, while cumulative prejudice may properly be assessed with respect to individual claims that have failed due to lack of prejudice, "nothing in our precedent relieves an appellant who claims cumulative prejudice from setting forth a specific, reasoned, and legally and factually supported argument for the claim. A bald averment of cumulative prejudice does not constitute a claim." *Commonwealth v. Hutchinson,* 611 Pa. 280, 25 A.3d 277, 319 (2011). Appellant has set forth no reviewable claim, and he is entitled to no relief.

In sum, after careful review of all of Appellant's issues, we conclude that none is meritorious and he is entitled to no relief. In addition, we deny Appellant's Application Pursuant to Pa.R.A.P. 2501, for Leave to File Post–Submission Communication in the Form of a Motion to Amend Claims and Submit Supplemental Briefing, or Remand to PCRA Court, for the reasons expressed in this opinion. *See* footnote 49. PCRA court order affirmed.[50]

**50.** The Prothonotary of the Supreme Court is directed to transmit a complete record of this case to the Governor in accordance with 42 Pa.C.S. § 9711(i).

Justice EAKIN did not participate in the consideration or decision of this case, Justice ORIE MELVIN did not participate in the decision of this case, Chief Justice CASTILLE, Justices BAER, and TODD join the opinion and Justice SAYLOR files a concurring opinion.

Justice SAYLOR, concurring.

I concur in the result, as I respectfully differ with the majority's approach to a number of Appellant's claims.

For example, in addressing Issue I (waiver of counsel, subsuming an asserted conflict of interest), *see* Majority Opinion, at 186–201, 47 A.3d at 76–84, the majority indicates that Appellant has not provided any explanation concerning why his view of his counsel's attitude toward him may have changed between the time of a June 30, 1995, pretrial hearing and the time of his trial in April, 1996. *See* Majority Opinion, at 188–90, 47 A.3d at 77–78. It seems clear enough from the briefs and the record, however, that Appellant's view changed materially as a result of his counsel's decision to report to the trial court, outside of his own presence, that the attorneys had heard indirectly from another public defender client that Appellant was contemplating stabbing one of his attorneys during the forthcoming trial proceedings.[1]

With regard to this alleged threat, Appellant testified at the post-conviction stage that he did not make it, *see, e.g.*, June 13, 2008, at 836, and no express credibility determination was

---

1. *See, e.g.*, N.T., April 3, 1996, at 40 (reflecting Appellant's pretrial explanation that "I don't understand where this is coming from. I feel I have the right to know.... I feel I have a conflict with my counsel and I don't believe they can represent me adequately if they're sitting there in fear of their life."); N.T., Apr. 12, 1996, at 12 (reflecting Appellant's remarks that his attorneys "are alleging statements I have made of the security issues, what I may do and may not do to counsel or to witnesses. I wasn't present. All I can tell is what I've been told."). *See generally* N.T., June 13, 2008, at 809–49 (relating, on post-conviction, Appellant's perspective that there was a progressive disintegration of his relationship with his attorneys).

In this regard, I do not mean in any way to criticize counsel's conduct in reporting safety concerns. My only purpose is to relate that I see this argument, and several others, in a different light from the majority perspective, and that my thoughts are not as categorical. *See, e.g.*, Brief for Appellant at 3–4.

made by the trial or PCRA courts. The asserted threat had been communicated in an extra-judicial report from a prisoner, and there was never any evidentiary hearing to corroborate or debunk the report. Moreover, prior to trial, the trial court explained to Appellant that it simply was not concerned with the truth of the accusations; rather, the court was implementing enhanced security measures to minimize counsel's safety concerns. *See, e.g.,* N.T., Apr. 3, 1996, at 39. Within this context, I now find the disposition on direct appeal (*i.e.,* that any conflict arose entirely from Appellant's own conduct, *see* Majority Opinion, at 190–91, 47 A.3d at 78–79), to be somewhat overstated.[2] In light of the overall circumstances, however, including that nature of the asserted crimes charged as a result of Appellant's killing spree and some other instances of his behavior in relation to his attorneys, I have little difficulty with the conclusion that counsel acted appropriately and that the security measures considered by the trial court, and those ultimately taken, were within the court's discretion.[3]

Another example of a difference in my approach to Appellant's claims occurs in relation to the assertion that the prosecution inappropriately failed to disclose the nature of its agreement with Commonwealth witness Christina Noland. *See* Majority Opinion, at 198–205, 47 A.3d at 83–87. As to this issue, the majority opinion reflects: the fact of a *quid pro quo* agreement between the prosecution and Noland; that the Commonwealth attorney did not tell the jury of Nolan's part of the bargain (*i.e.,* that she was testifying *in exchange* for the Commonwealth's agreement not to pursue first and second

2. I acknowledge, nonetheless, that I did not fully appreciate the context at the time of the direct appeal, as I joined the majority opinion outright.

3. With regard to the trial court's prohibition on note-taking by stand-by counsel, *see* Majority Opinion, at 195–98, 47 A.3d at 81–82, I would generally disapprove such restriction absent specific and substantial justification. The only reason I can conceive which would support such a restriction was the uncorroborated hearsay information that Appellant might be planning to assault counsel with a writing instrument. The court, however, already was planning to take measures short of an outright ban on note taking which would suffice for Appellant, *see, e.g.,* N.T., Apr. 4, 1996, at 50, and there does not appear to be any reason why the same could not be done for counsel.

degree murder charges); and that, on cross-examination, Noland adamantly denied that she had any agreement whatsoever with the Commonwealth. The majority, however, does not squarely address Appellant's contentions that the Commonwealth should have disclosed the *quid pro quo* aspect of the agreement, and that the prosecutor violated his obligations under United States Supreme Court precedent when he sat mute during Noland's false trial testimony that there was no *quid pro quo*. *See* Brief for Appellant at 28 (citing *Giglio v. United States*, 405 U.S. 150, 153–54, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972) (explaining that a prosecutor has the obligation to correct false evidence where it appears)). In absence of an effective rejoinder to Appellant's position in these regards, my own analysis turns on the prejudice criterion. *See Giglio*, 405 U.S. at 154, 92 S.Ct. at 766.

Finally, consistent with my position in other cases, I would disapprove the prosecutorial practice of urging capital jurors to approach their sentencing decision with the same mindset as the defendant maintained at the time of the killing, *see* Majority Opinion, at 239, 47 A.3d at 108, and I hold a similar opinion with respect the district attorney's indication to the jury that the victim's family demanded Appellant's execution, *see id.* at 229–31, 47 A.3d at 102–03. Although I agree with the majority that these remarks employ rhetorical flair, their potent substantive content should not be overlooked. In my view, justice would be better served, and protracted controversies more readily contained, if prosecutors would limit themselves more closely to the facts of the case in the context of the governing law.